State v. Sexton.

---

## THE STATE v. SEXTON, Appellant.

### Division Two, December 6, 1898.

1. **Murder:** SUFFICIENCY OF EVIDENCE: DYING DECLARATION: PRIOR THREATS TO ROB. Deceased died from a wound inflicted by a bullet of a size used in defendant's revolver, which he had with him on the day of the homicide. Deceased's dying declarations stated that defendant had shot him while attempting to rob him, and defendant had previously declared an intention to rob him. *Held,* sufficient to sustain a conviction.

2. ———: CORRESPONDENCE BETWEEN SHOES AND TRACKS. Evidence of a correspondence between defendant's shoes and tracks, found at the place of a murder, of which he is accused, is admissible, though the shoes were not fitted into the tracks until two or three days after the murder.

3. ———: ———: USING SHOES AS EVIDENCE: SELF-INCRIMINATION. Where one accused of murder voluntarily surrendered his shoes to the sheriff, evidence of a correspondence between the shoes and tracks in the place where the murder occurred is not inadmissible, as being contrary to defendant's constitutional right not to appear as a witness against himself.

4. ———: IN SECOND DEGREE: ATTEMPTING ROBBERY. Where defendant is accused of being the one who committed murder while attempting to perpetrate a robbery, a refusal to charge on murder in the second degree is proper, in view of Revised Statutes 1889, section 3459 (Laws 1885, p. 138), making it murder in the first degree to commit a homicide while attempting to perpetrate a robbery.

5. ———: DYING DECLARATIONS: SUFFICIENT BASIS: MATTER FOR COURT. A question as to whether a sufficient basis has been laid for the admission of dying declarations is for the court.

6. ———: ———: DIRECT EVIDENCE. Dying declarations giving the details of a murder and the name of the murderer are direct, and not circumstantial, evidence of the murder.

7. ———: DECLARATIONS OF OTHERS: RES GESTAE. The declarations of several persons made when they heard the firing of a revolver, which caused a murder, are admissible as a part of the *res gestae*, though they were in a house at some distance from the place of the murder.

*Appeal from Mercer Circuit Court.*—HON. P. C. STEPP, Judge.

AFFIRMED.

ORTON & ORTON for appellant.

(1) The circumstantial evidence made out a case against the defendant without the dying declarations of the deceased, Nathaniel Starks. It would be a case where the killing could be inferred without anything else appearing. The doctrine laid down in State v. Frazier, 137 Mo. 341, is applicable.

State v. Sexton.

State v. Holmes, 54 Mo. 133; State v. Grant, 76 Mo. 236; State v. Anderson, 89 Mo. 312; State v. Tabor, 95 Mo. 385; State v. Evans, 124 Mo. 411; State v. Young, 119 Mo. 525. Under such state of facts, the law would presume that the homicide was murder in the second degree and defendant's fourth instruction should have been given. (2) The testimony of witness Snyder, as to the shoe tracks was irrelevant and went to prove no probative fact in the case.    It was an error to admit it.    State v. Thomas, 99 Mo. 257.    Snyder testified that it was three days after the homicide was committed that the shoes were fitted into the tracks.    Mr. George showed the tracks to witness, and George was never introduced in the case, and in no way are the tracks shown to have been made by the person who committed the homicide, other than that they were found three days after in the neighborhood where the crime was supposed to have been perpetrated.

EDWARD C. CROW, Attorney-General, and SAM B. JEFFRIES, Assistant Attorney-General, for the State.

(1) Defendant objected to the testimony of witness Snyder upon the question of comparing the footprints found near the scene of the tragedy with the shoes worn by defendant.    We claim that this evidence was perfectly admissible. It is true the comparison was not made until a few days after the crime, but the evidence of the deceased on his dying declaration shows that the defendant emerged from the brush and assaulted him while he was on the wagon.    It is shown by witness Snyder that those footprints that he found and compared with the shoes of the defendant, were on the side of the road and down in the sand under the brush.    The law of evidence guarantees the right of correspondence between shoes and tracks of persons supposed to be guilty of homicide. 1 McClain's Crim. Law, sec. 408; Ruloff v. People, 45 N. Y. 213; Com. v. Russell, 78 Va. 400; Campbell v. State, 55 Ala. 80.    (2) An examination of the testimony in this case will

show that the defendant was either guilty of murder in the first degree or should have been acquitted. All of the evidence introduced upon the part of the State shows that the person who mortally wounded the deceased did so in an attempt to commit the crime of robbery, and when death ensues under such circumstances, it is always held to be murder in the first degree. State v. Miller, 100 Mo. 606; State v. Hopkirk, 84 Mo. 278. (3) The court instructed the jury fully and completely upon the question of circumstantial evidence.

SHERWOOD, J.—Ira Sexton, twenty-three years old, has been convicted of murder in the first degree, the charge being that Nathan Stark was killed by him with a pistol.

Luvilla Anderson was also charged in the same indictment with aiding and abetting, etc., in the murder; she was the sister-in-law of defendant, who had been married about five days and was, at the time of the homicide, living at Newt. or "Buff" Melton's, who was a brother of Luvilla Anderson's.

Buff Melton lived a quarter of a mile from where Nathan Stark lived, who was a bachelor, thirty-six years old, and lived by himself on a small farm, in a house southwest of where Buff Melton lived.

Late in the afternoon of October 28, 1897, Cooksey drove up in a buggy from Mercer, to Buff Melton's house; Mercer was a town or station on the Rock Island railroad in the county, some three or four miles distant. On arriving at the house about sundown, he met Luvilla Anderson at the west door of the house, she was the only one in the house at the time, but shortly thereafter there came in, Josie Melton, Buff's wife, Hattie Sexton, defendant's wife, defendant and Robert Melton, and Buff Melton and Cooksey was introduced to them. Cooksey saw in one of the four rooms of the house, known as the southwest room, a clock on a mantlepiece and beside the clock, on the right hand side of the clock, was lying a revolver. Cooksey went out with Buff Melton to see about

his horse, and having watered him and taken the harness off, they returned to the house. About twenty-five or thirty minutes before the occurrence which caused the present prosecution, defendant left the house, passing through the room in which the revolver lay, saying he was going over to see his father, who lived about a mile and a half distant. On returning from attending to his horse, Cooksey, Buff Melton and the rest except Luvilla Anderson sat down to the supper table. While sitting there, and in about ten or fifteen minutes after defendant's departure, Luvilla Anderson came to the door of the kitchen where supper was being eaten, and asked Hattie Sexton where her cloak was, or something similar to that, and she says "you know what I mean." Proceeding, the witness Cooksey says: "We ate some few minutes, when we heard something, which was a shot, and then after that we heard screams which I took to be an owl hallooing. As I heard the first noise it sounded like an owl. I says, 'Listen, that sounds like an owl.' I listened a second; I thought it was some one hallooing fire. When it come up again, and Robert Melton; that was Robert Melton that was sitting next to the east window in that same room. He says: 'No, some one shot.' I says: 'No, that is it; some one is hurt.' I heard another yell. We all jumped up as far as I know; Buff and I anyway started into the other room; that is the room right west of the kitchen; the kitchen was east of the room I first went into where we eat.

"Q. That is the one you designated as the southwest room; you went into the room you designated as the southwest room?

"A. Yes, sir; as I came into the house I had a rifle with me, and I took the load out of it and laid it either on the bed or under the bed, I don't know which. As I put the rifle on the bed when I went into the room, I grabbed up the rifle. I said to some one 'get that revolver' that I had noticed there. We all ran out of the house. Some one spoke up and

said it wasn't there.  I don't know who it was.  Some one
says, 'He has got it.'

"Q.  Well, when you went out there, don't tell what you
said, but what you did.

"A.  Well I went into the room and got my rifle that
was either on the bed or under the bed, and I put a load into
it as I went out at the door, and Buff Melton he got a shotgun;
Buff Melton did, and I had a rifle.  We got as far as the
buggy, and the loud yelling and hallooing had ceased at that
time.  Then we crawled through a wire fence and went
across the stock field.  The boys started rather fast.  I says:
'Hold on.'

"Q.  In what direction, or do you remember?

"A.  That would be southwest, I believe.

"Q.  Over what kind of ground?

"A.  Stock field.

"Q.  How about with reference to it being up or bottom
land?

"A.  It was up a hill; up a little rise; I don't know
just how much; anyhow there was a little draw, I believe.
It was after night.  We met Luvilla Anderson coming from
the direction we were going in.  We were going, as near as
I can tell, in a southwest direction and we met her coming
from the southwest.  I saw her and hallooed, 'hello,' or some-
thing to that effect.  We all went then across to Craven's.

"Q.  Now who all was there with you at that time?  A.
Buff and Robert Melton and Luvilla Anderson and myself;
and when we got there I wasn't acquainted with anyone.  I
had seen Mr. Stark as I went past his barn that evening, and
he was in the room there lying on the bed."

There were several families who lived in the neighbor-
hood and who heard the cries mentioned by the witness Cook-
sey, and they immediately went towards the scene of the cries;
among them William Cravens, who lived some three hundred
to three hundred and fifty yards from Nathaniel Stark's
house.  He states:

"I got up, went out, heard somebody. At first I didn't see nothing when I went out, when I heard him. I stood out at the gate ten feet from the door, I expect, and heard someone running and hallooing taking on just like they were out of breath. He hallooed, 'help me and get to me;' I went and met him, it was Stark. Well, I met Stark out from my house, between forty and sixty yards west of my house. I heard him. What called me out there I heard him crying, hallooing for help. I ran out and met him. He was hallooing for me; calling me by name, Bill, to get to him and help him. I met him, asked him what was the matter. He said Ira Sexton had shot him, stopped him up there on the road and tried to rob him and they got into a tussle; he got away from him and Sexton shot him as he ran and followed him a piece and turned back. And then he ran on towards my house hallooing for me to get to him and help him. I went to him and began to inquire into it. He told me Sexton had shot him; he says, he has killed me, Bill. I says, you are scared, Nate, you are not hurt as bad as you think you are; he says, Oh, he has killed me, he has done the work for me. I took him on to the house. He said he wanted to get to my place where he could tell it and who done it." Q. "Tell it; what?" A. "That Ira Sexton had shot and killed him, he says, he has killed me. Well, Sexton met him there and come out of the brush; he says he mistrusted something as soon as he saw him. Well, he said Sexton told him that Newton Melton and the boys and Luvilla is down to your house; you don't want to go any further, they are down there and going to kill you and take your money away from you. Oh, he says, that can't be so, Ira, we have always been good friends. I don't believe it. Yes they are, he says; if you go home they will kill you and rob you. He says we have always been on good terms, I can't believe it; said, loan me your revolver; I have accommodated you, loaned you horses and money and accommodated you, and loan me your gun. Sexton says, I

haven't got no revolver with me; come out here with me and I will fix you for them, or something to that effect. He says no, I will go on. He says I spoke to the horses; they stepped maybe a step or two and Sexton just ran out and shoved a revolver against me and says, 'your money is what I want, damn you,' shoved it at me. I haven't got it, he says, and shoved it in his face. We had a tussel and I fell off the wagon and as I ran from him he tore after me and shot me; I was eight or ten steps from him, I think, Bill, when he shot me."

Q. "Tell the jury what he said Sexton *done,* if anything, after he shot him." A. "He said Sexton hollered at him to stop. He says I wanted to get to your place so I could tell it, if I lived to get there." Q. "What did he do with his money?". A. "He gave it to me when we got to the house. I asked him as soon as we met, nearly; I says, did he get your money, Nath? He says no, and I think as we went into the yard gate he handed it to me; I was kind of rattled. How much money did he have? I asked him how much he had; he says; I have got right at $60, Bill; it wasn't counted for some time; there was fifty-nine dollars in money, is what there was. In that conversation did Stark tell you just where he was when he was stopped by Sexton, and where his team was? He told me right out there at the Millinax ground; right close, he says, he has killed me right where Mullinax was killed."

Mrs. Farris, another of Stark's near neighbors also heard the cries of some one in distress, and started in the direction from which they came; she went over to Craven's house. On her way with others, she heard some one running down through a woods pasture from the direction where Stark was shot, in the direction of the house of defendant's father. Between this point where Mrs. Farris heard some one running, and the home of defendant's father, one Gann lives. Gann testified that about dusk that night, he saw somebody passing through his hog lot, his dog barked at him, whereupon the passer-by spoke to the dog and Gann recognized defendant's

voice.   Gann further says, that defendant, having spoken to the dog, climbed over the fence and went towards his father's house.

On reaching Craven's house, Mrs. Farris says:   "Well, I went in and he was laying on the bed; he seemed to be suffering a right smart; I went to him and says, 'what's the matter, Nath?'   He says, 'I am killed.'   I says, 'Who in the world has done it?'   He says, 'Ira Sexton shot me.'   I says, 'What did he shoot you for, Nath?'   He says, 'For my money, he tried to rob me.'   I says, 'You are suffering a great deal?'   He says, 'Law, yes; he has done the work for me.'   He reached up his hand and commenced crying.   I says, 'Nath, I hope you are scared worse than hurt.'   He says, 'No, Mrs. Farris, I am going to die,' he says, 'but I'll live again.'   He kept crying and I kept talking to him. . . . . . . . He said he was coming from Mr. Neal's with a load of corn, and had just turned off from the Mullinax ground; he says the horses looked south; they seen something and kind of scared like. He says that he seen the object, or kind of heard it in the bushes, and Ira Sexton stepped out in front of the wagon like and spoke to him and stopped.   He kept kind of moving along the horses.   He says, 'Stop, Nath,' he says he kind of halted; he says, 'You don't want to go down home,' and Nath says, 'Yes, I must go on; I am in a hurry.'   He says, 'Newt Melton and the boys and Luvilla is down there; they are going to rob you and kill you for your money.'   'Why,' he says, 'I don't believe that; me and Newt Melton has always been good friends.'   'Well,' he says, 'they are going to kill you;' he says, 'you come down here I'll tell you something;' he says, 'you come down here in the brush and I'll tell you something.' He says, 'I won't do it, and then he threw the revolver up in my face;' but before he threw the revolver in his face he says, 'Ira, I have been a good friend of yours, and you be a good friend to me and loan me your revolver and I'll fix them when I get down there.'   Ira says, 'I haven't got none Nath.' 'Yes.

you have.' 'No,' he says, 'I haven't,' but he said at that time then he threw the revolver up in his face; 'just pointed it up,' he says, 'to me, then' he says, 'it just glittered.' He says, 'I just grabbed at it, held on the muzzle and kind of pushed it down.' Ira says, 'It's your money I want.' Nath says, 'I haven't got any.' 'Yes you have, damn you, it's your money I want.' He says, 'I held on the revolver, and he was a little stronger than I was, and he pulled me off the wagon; strong tussle, but I kept the muzzle pointed down, and when I struck the ground I fell kind of down on my knees, and I got up running, and when I got about ten steps,' he says, 'when the bullet struck me in the back there.' I says, 'Did it hurt you awful bad?' 'Kind of numbed me,' he says." This witness further states that Stark stated that after defendant shot him once, he ran after him and tried to shoot him again, but the revolver wouldn't go off; that thereupon defendant turned back west from where they were.

Stark lived from Thursday night until Saturday morning about 5 o'clock. Various other witnesses corroborated the testimony of Mrs. Farris.

Before dying, Stark made the following dying declaration:

"State of Missouri, ⎱ ss.
"County of Mercer. ⎰

"I, Nathaniel W. Stark, realizing and believing that I am now approaching death and being of sound mind state: I was driving in the road on the 28th day of October, 1897; Ira Sexton come out of the brush on the side of the road and said halt 4 or 5 times, I knew his voice and stopped my team and he said; Newt. Melton, Villa Anderson and some young man who come there to-day were laying at my house to kill me and get my money. I asked him if he was not joking and he said no that he told me the fact and I asked him for his revolver and if they tried to kill me I would be six to their half dozen, he said no that won't do. I said I have been

good to you and loaned you $5 and let you have my team.
Then he jerked his revolver out and said 'give me your money.'
I jumped out of the wagon and then he said 'give me your
money' twice. Then I run about ten steps and him after me;
then he shot me and that is what is killing me. I still kept
running. The shooting occurred about 175 steps west of my
house [and as I ran by my house I saw the woman that Sex-
ton said was at my house (Villa Anderson) standing close to my
henhouse on the south side of the same. She asked where I
was going. What is the matter? and said 'come here.' I
feared she would hold me there till Sexton come and he would
kill me, so I run on past till I met William Cravens, when I
fell to the ground, he helped me up and brought me here to
his house and I sunk on the floor and he (Cravens) helped me
on the bed. I know it was Ira Sexton who shot me].

"Nathaniel <sup>his</sup> x W. Stark.<br>mark

"Attest:

"D. W. Reed,

"C. R. Neel,

"Lloyd Reed.

"Subscribed and sworn to before me this 29th day of
October, 1897.

"S. T. Willford,<br>
"Justice of the Peace in and for<br>
"Marion Township, Mercer Co., Mo."

The court, on the objection of defendant's counsel, re-
fused to admit in evidence that portion of the declaration
within brackets.

The testimony shows that Stark was shot with a 38 cal-
iber pistol, a ball of that size having been taken from Stark's
body either before or after death. The testimony also shows
that defendant was the owner of a revolver of that caliber, and
nothing was ever seen of the revolver which lay on the mantel-
piece in the southwest room after defendant passed through
there, having announced his intention of going to his father's.

There is testimony also that the ball in this case struck Stark in the right hip bone, passed through it into the abdomen, piercing several of the intestines and lodging just under the skin of the opposite side of the abdomen. The shoes of defendant were taken and compared with some tracks that were found in the sand alongside of the ravine and in the brush from where the defendant is purported to have emerged and assaulted the deceased and around the spot where the assault was made; and comparison showed that the tracks were made by the same kind of a shoe and the same size and same mould.

This evidence was objected to upon the part of the defendant on the ground that it deprived him of his lawful right not to appear as a witness against himself. It was shown by the evidence that the defendant, a few days prior to the tragedy, had made the remark that it would be no trouble to rob the deceased as he lived there alone and that he intended to do it, and he always kept a good deal of money around and he was going to have that money or know the reason why.

There was some evidence also introduced on behalf of defendant which, perhaps, tended to show an *alibi*.

There were on the part of the State various criminating circumstances other than those previously mentioned, but it is unnecessary to mention them, as sufficient evidence has been adduced to show, if believed by the jury, that defendant was guilty beyond a reasonable doubt of the crime laid to his charge. Having outlined the evidence sufficiently for the purpose of comment thereon, we pass to the errors assigned.

1. As to whether Thompson was incompetent as a juror, is governed by the principles announced in State v. Taylor, 134 Mo. 109, and other cases.

2. The testimony as to tracks being found "in the brush" near the scene of the homicide, and that according to the dying declaration of Stark, defendant emerged from that

brush when he presented the revolver and demanded Stark's money, and that the shoes of defendant fitted those tracks, was competent evidence (1 McClain's Crim. Law, section 408), and the admissibility of such evidence was not affected by the fact that two or three days had elapsed between the time of the shooting and the fitting of the shoes to the tracks; that was for the consideration of the jury; they were to give to the correspondence between the shoes and the tracks such weight as they thought it to be entitled. Nor was the use of defendant's shoes for the purpose indicated, any violation of his constitutional rights, since he surrendered his shoes upon request of the sheriff. If they had been forced from him and then used against him, a different question might be presented not necessary to be now considered. It may however, be remarked in concluding this paragraph, that in a case from St. Louis decided about a year ago, we held that articles obtained by breaking open a defendant's desk in his absence, might be used as evidence in a case where a crime was charged.

3. The trial court very properly refused to give an instruction on murder in the second degree. Under the evidence, defendant was either guilty of murder in the first degree or he was innocent of any crime whatever, inasmuch as section 3459, Revised Statutes 1889, makes it murder in the first degree where a homicide is committed in the perpetrating or attempt to perpetrate any robbery, etc. It would seem strange that so plain a statute should have ever been so misconstrued on this point as was done in State v. Earnest, 70 Mo. 520, and in State v. Hopper, 71 Mo. 425. But we have long since hung red lights on those cases (State v. Hopkirk, 84 Mo. 278; State v. Meyers, 99 Mo. 107; State v. Miller, 100 Mo. 606), and the legislature by a subsequent amendment of section 1232, Revised Statutes 1879 (see Laws 1885, page 138), adopted the views of this court in Hopkirk's case, and placed them in the form of a statutory amendment.

4. Pursuing in substance the course indicated by this court in State v. Cantlin, 118 Mo. 100, defendant's counsel after excepting to the giving of the instructions on behalf of the State, moved the court to instruct the jury:

First. Upon the whole law of the case.

Second. Upon the law of murder in the second degree.

Third. Upon the law applicable to the condition in which the jury must believe the different links of circumstantial evidence introduced in the case ought to bear to each other before they should convict the defendant.

Fourth. That upon the law applicable to the conditions under which the declarations of Nathaniel Stark should be considered and for the establishment of what facts said declarations are to be confined when considered by the jury.

Fifth. Upon the law applicable to the defense of an *alibi*.

Sixth. Upon the caution to be used in considering the evidence of admissions of the defendant.

The trial court refusing to instruct the jury other than it already instructed them, defendant's counsel again excepted. The court had instructed the jury on all questions arising in the case which were necessary for their information in giving their verdict: To wit, on the question of *alibi;* on circumstantial evidence; upon the caution to be used in considering the evidence of admissions of defendant, and in these respects approved precedents were followed. Respecting the dying declarations of Stark there was ample evidence upon which the trial court acted in permitting the evidence of such declarations to go to the jury. And it belonged exclusively to the court to determine whether a sufficient basis had been laid for the admission of such declarations (State v. McCanon, 51 Mo. 160; State v. Johnson, 118 Mo. 491), and if dying declarations are improperly admitted in evidence, this constitutes grounds for reversal after judgment. [State v. Johnson, 118 Mo. 491, and cases cited.]

With the point of the admissibility of such declarations a jury has nothing to do, and therefore should not be instructed on that subject. This being the case, the instruction which, in substance, left it to the jury, if they believed the declarations offered, to give them that weight they thought they ought to have, when considered in connection with other circumstances in evidence, was correct.

5. The third instruction asked by defendant and refused by the court, was properly refused, because it was not true that there was "no direct evidence as to the commission of the homicide." The declarations attributed to Stark furnished direct evidence of the homicide. So that the evidence was not confined to that of a circumstantial character.

6. There was no error in admitting the statements made at Buff Melton's house, by those who were leaving the house after the shot was fired. Declarations of this sort are part of the *res gestae,* and are frequently admitted even when made by third persons. [State v. Gabriel, 88 Mo. loc. cit. 639 et seq.]

Finding no error in the record, we affirm the judgment and order that the sentence pronounced by the law be executed. All concur.