THE STATE OF KANSAS v. PATRICK O'SHEA.

No. 11401.

1. HOMICIDE—*Qualification of Jurors.* The mere fact that a person called as a juror had formed or expressed an opinion that the defendant shot and killed the deceased did not disqualify him as a juror, where the shooting and killing was conceded by the defendant, who claimed that it was done in self-defense.

2. ———— *Dying Declaration—Restricted to Res Gestœ.* Dying declarations are admissible in homicide cases, but they are restricted to the act of killing and the circumstances immediately attending the act which form a part of the *res gestœ.* Statements relating to former and distinct transactions, not immediately connected with the killing, cannot be received.

3. ———— *Conclusions and Opinions.* Declarations consisting of conclusions, opinions and beliefs which would not be received if the declarant were a witness are not admissible.

4. ———— *Declarations Discredited by Proof of Declarant's Condition.* Such declarations may be contradicted in the same manner as other testimony, and may be discredited by proof that at or about the time of making the declaration the deceased was in a reckless, irreverent state of mind, and frequently indulged in profane language, and that he entertained feelings of malice and hostility toward the defendant.

Appeal from Sedgwick district court; D. M. DALE, judge. Opinion filed July 8, 1899. Reversed.

STATEMENT.

On January 6, 1898, an information was filed in the district court of Sedgwick county charging Patrick O'Shea with an assault on James Dawson with intent to kill him. A trial of the charge resulted in a conviction and a sentence to the penitentiary for a term of eight years. He appealed from the conviction and judgment, and upon a review in the supreme court the judgment was reversed and a new trial ordered. (*The State v. O'Shea,* 59 Kan. 593, 53 Pac. 876.) After the reversal and on September 13, 1898, Dawson

died, after which a new information was filed, charging O'Shea with the murder of Dawson. At the trial the state offered in evidence what purports to be a dying declaration of Dawson, and the court admitted the greater part of it, stating that the excluded part might become competent in rebuttal. The part received at the opening of the trial is as follows:

"DYING STATEMENT OF JAMES DAWSON.

"*Firmly believing in a God and in a hereafter, and realizing and believing and being advised by my physician, and fully realizing the same, and being convinced that I am mortally wounded and that I am about to die and meet my Creator, I desire to and do make this statement, which I make under the firm belief and with the knowledge that I shall never recover and that I am about to die: In the afternoon of November 14, 1897, I went up to Paddy Shea's place in the north part of town, as I had frequently been there before, and spent some ten or twelve dollars for drinks and became partly intoxicated, and in the afternoon we had a little difficulty in which a gun was accidentally discharged — how or in what manner I do not know — after which we had some conversation with the officer, and Shea and I took several drinks, and we were friendly. We had no difficulty that I remember of in the afternoon. He went out to the car with me and assisted me on the car, and asked me to come back again, after which I came down town. I did not attempt to kill or harm Shea in any manner in the afternoon. I had no cause for it; always thought we were the best of friends. While down town I first missed my pocketbook, containing some $300, and I went back to Shea's place in the evening after it. The pocketbook was either taken out of my pocket or fell out of my pocket during the scuffle in the afternoon, and I thought Shea had it, and I went back after it. The pocketbook contained $300 and a receipt. Mr. Shea knew that I carried the money, and that I had it with me Sunday afternoon. When I went back in the evening I went back in a hack. The hack drove up to the front door and I got out. Knowing it was Sunday afternoon, and that Paddy did not keep the front door open Sunday, I went*

*around to the back door and knocked at the back door, and a voice from the inside, which I recognized to be Shea, said, 'Who is there?' and I said 'Ed.,' as Paddy always called me 'Ed.,' and I was recognized and called by the name of Ed. frequently.* He said, '*All right; come around to the front door.*' *I went around to the front door, and met Officer Gamble at the northeast corner of the building. Gamble had been there in the afternoon and had drank some with us.* As I stepped upon the porch the door was opened from the inside and I walked in. As I walked in, Paddy stepped up to the west end of the bar, and I said, ' Paddy, I lost my leather this afternoon,' meaning my pocketbook. Paddy said, ' What?' I said again, 'Paddy, I lost my leather here this afternoon, containing my money,' and he said, ' You are a God-damned lying son-of-a-bitch,' and pulled his gun from behind him and shot. I attempted to get out of the door, but the door stuck, or I could not open it quick enough, and as I was trying to open the door and get out he shot me again in the back and I fell right by the side or in front of the door. After I was down he gave me a kick in the ribs, *which broke one of my ribs. At that time I had no gun with me at all and did not attempt to shoot Paddy but attempted to get away from him. All I went there for was my money which I lost there in the afternoon. I had always thought Paddy and I were the best of friends. I made him a present of a revolver in the afternoon of the evening he shot me and also of some jewelry, and I have frequently spent much money in his place and he has frequently taken me around town and introduced me to various people as his schoolmate and his friend, and, so far as I know, we were friends. I never in any manner or form, to my knowledge, attempted to harm Paddy; I had no reason to do so. At the time I went to Shea's place Sunday night, I had no gun with me and did not go there for any other purpose than to get my pocketbook and my money. I had no ill will against Paddy at all at the time he shot me, and have none now whatever, except to regret that he has shot me without any cause or provocation whatever. I did say, after I was shot, 'Paddy, what did you do this for?' I also asked him if I had any legs. I do not know why Paddy shot me unless he*

*did not want me to get my pocketbook and money there. I think that I stated all that I remember and recall now of the transaction, at least all that comes to my mind now, and I make the above and foregoing statement without malice or ill will toward any one; I fully realize that my life is about ended and that I am about to go to the great beyond, and that I am on my death-bed, and that the wound that I received is about to end in my death, and that I am about to die, and I have made the above and foregoing statement with full realization that I am about to die and that I am on my death-bed and shall never recover.*

JAMES E. DAWSON."

Objections were made to the reception of the declaration, and to every paragragh, sentence and word of the same, and special complaint is made of the portions of the declaration which are italicized.

After the testimony of the defendant had been offered, the state was permitted to read the remainder of the dying declaration, which was first omitted, and which is as follows : *" The nickel-plated gun or white gun that Paddy said he found by my side was not my gun, and I never had it. It belonged to a man by the name of Black Jack. I never told McAlister in the evening that I was going to kill Paddy, or anything to that effect. I did not have any conversation with Mr. McAlister in the evening at all. Neither did I tell John Herrig that I was going to kill Paddy, nor any words to that effect. Neither did I tell any person at any time that I was going to shoot or kill Paddy or any words to that effect or meaning that. I got her to deed her interest in Paddy's property to him at Paddy's request. After I was shot I did not say to Paddy: 'Paddy, you was too quick for me,' or words to that effect. I did not say to Paddy or any one else: 'Paddy, I do not blame you for this.'"*

Objections were made to rulings on testimony preliminary to the introduction of the dying declaration, and also to the exclusion of testimony tending to dis-

credit and impeach the declaration itself. The trial resulted in a conviction for murder in the second degree, and the defendant was sentenced to thirty years in the state penitentiary. He appeals.

*A. A. Godard*, attorney-general, *S. B. Amidon*, county attorney, and *J. F. Conly*, for The State.

*Adams & Adams*, and *R. R. Vermilion*, for the appellant.

The opinion of the court was delivered by

JOHNSTON, J.: The first objection brought to our attention in this review is to the rulings of the court on challenges of persons called to serve as jurors. Some of them stated on their *voir dire* that they had formed opinions as to the commission of the offense charged, but it appears upon further examination that the opinions so formed did not extend beyond the fact that O'Shea had fired the fatal shots. The fact that Dawson was shot by O'Shea, and that death resulted from the shooting, was not disputed. Throughout the trial the shooting and consequent death of Dawson were conceded, and the claim of the defendant was that the act was justifiable, being done in self-defense. Opinions upon matters not in issue do not disqualify the jurors entertaining them, and especially where, as in this case, it is shown that they have not formed or expressed an opinion as to the guilt or innocence of the defendant, and where there is nothing indicating that they cannot give the defendant a fair and impartial trial. (*The State v. Wells*, 28 Kan. 321; *The State v. Gould*, 40 id. 258, 19 Pac. 739; *The State v. Wells*, 54 id. 166, 37 Pac. 1005.)

·The controlling questions in this case arise upon the admission of statements contained in what is

termed the "Dying Statement of James Dawson." Objections which are deemed to be sufficient were made to every part of the dying declaration, and the contention is that many of the statements were mere hearsay conclusions, and such as cannot be shown in a dying declaration. There is good reason for the complaint that is made. Many of the statements are in relation to former transactions distinct from the act of killing. Some of them are matters of opinion or belief; some are mere conclusions as to a motive for the commission of the offense; others would not have been competent if made by the declarant as a witness upon the stand. Although there was a great deal of testimony as to the killing and the circumstances connected with it, probably no testimony produced before the jury was so impressive and telling in its effect as the statements contained in the dying declaration. It is well known that jurors give great weight to statements made by those conscious of impending death and who, without hope or expectation of recovery, are supposed to be free from passion or prejudice or any motive which would induce a false or colored statement. It cannot be said, therefore, that the statements claimed to have been made by the deceased, and which were erroneously received, were immaterial or without prejudice.

The rule admitting such declarations, made without sanction of the oath, not in the presence of the defendant, and where there is no opportunity for cross-examination, is exceptional, and because it cannot be subjected to the ordinary tests it is necessarily restricted. It is limited to cases of homicide, and is confined to the act of killing and the circumstances immediately attending the act which form a part of the *res gestæ*. Statements relating to former and dis-

tinct transactions, and embracing facts and circumstances not immediately connected with the killing, cannot be received. Mere conclusions, opinions and beliefs, which would not be received if the declarant were a witness, are not admissible. (*The State v. Medlicott*, 9 Kan. 257; *State v. Draper*, 65 Mo. 335; *Lieber v. Commonwealth*, 9 Bush, 11; *Starr v. Commonwealth*, 97 Ky. 193, 30 S. W. 397; *State v. Shelton*, 2 Jones [N. C.] 360; *Nelson v. State*, 7 Humph. 542; *Hackett v. The People*, 54 Barb. 370; *Reynolds v. The State*, 68 Ala. 502; *The State v. Baldwin*, 79 Iowa, 714, 45 N. W. 297; *People v. Fong Ah Sing*, 64 Cal. 253, 28 Pac. 233; *Montgomery v. The State*, 80 Ind. 347; Whart. Crim. Ev., § 288; 1 Greenl. Ev., § 156; 10 A. & E. Encycl. of L., 2d ed., 376.)

The statements of what occurred at O'Shea's place in the afternoon before the shooting were separate and distinct transactions, and manifestly inadmissible. After these occurrences Dawson went to another part of the city, and did not return until nine o'clock at night, which was seven or eight hours later than the transactions of the afternoon. While these occurrences may be proper testimony for some purposes, if related by competent witnesses, they were not immediately connected with the killing, and therefore were not receivable as dying declarations. As said in *Montgomery v. The State*, supra, "matters which do not form part of the *res gestæ* are not provable by dying declarations. The rule is confined to a statement of the circumstances connected with the fatal act and forming part of the same transaction. It is quite well settled that what occurs before or after the act has been done does not constitute a part of the *res gestæ*, although the interval of separation may be very brief." The statements related to the matter of

motive and state of feeling between the parties, and were in direct conflict with the testimony given on behalf of the defendant. Statements to the effect that he had with him in the afternoon a pocketbook containing $300; that defendant knew that he carried it and had it with him; that it was either taken or fell out of his pocket in the afternoon, and that he thought the defendant had it; that he went back at night after his money, etc., were especially prejudicial, as they, in a certain sense, attributed to the defendant the taking of the money, and suggested the motive that the defendant may have killed Dawson to conceal the larceny and to prevent the recovery of the money.

The statements that they were friendly and had no difficulty in the afternoon; that he had always thought that he and the defendant were the best of friends; that he had frequently spent much money at his place, and had been taken around and introduced by the defendant as a schoolmate and friend; that on the afternoon of the day he was shot he made him a present of a revolver and also of some jewelry, were wholly inadmissible as dying declarations, within the rules stated and the authorities cited. From these statements the jury might infer that there was no provocation or cause for the killing, nor any reason for the defendant to shoot in self-defense. Besides, they were objectionable in form, being largely opinions, beliefs and conclusions which would not have been competent testimony in the first instance if given by Dawson as a witness.

Equally objectionable were the statements that he had never in any manner or form attempted to harm "Paddy," nor had any reason to do so; that he had no gun with him, and did not go there for any

other purpose than to get his pocketbook and money; and that he was shot without any cause or provocation whatever. The statements made by him, and which were introduced in rebuttal, contradicting the defendant and other witnesses, formed no part of the *res gestæ* and could not properly be included in a dying declaration.

Testimony tending to show that the deceased frequently used profanity to the nurses and attendants just before his death, about the time the dying declaration was made, was offered by the defendant and excluded. In view of the character of the declaration and the statement by him that he firmly believed in a God and in a hereafter, and that he was about to die and meet his Creator, these statements were competent to contradict and impeach his declaration. The supreme court of the United States holds that such declarations may be contradicted and impeached in this manner. It decided that such "declarations by no means import absolute verity." "The history of criminal trials is replete with instances where witnesses, even in the agonies of death, have, through malice, misapprehension, or weakness of mind, made declarations that were inconsistent with the actual facts; and it would be a great hardship to the defendant, who is deprived of the benefit of a cross-examination, to hold that he could not explain them." In the same connection, the court stated that such declarations "may be discredited by proof that the character of the deceased was bad, or that he did not believe in a future state of reward or punishment." (*Carver v. United States*, 164 U. S. 694, 17 Sup. Ct. 228.)

In *Tracy v. People*, 97 Ill. 101, it was held that "when dying declarations are offered in evidence, it is competent for the accused to show by cross-examination

of the people's witnesses, or by other witnesses, that the deceased in making the statements was in a reckless, irreverent state of mind, and entertained feelings of malice and hostility toward the accused ; and proof of the indulgence in profane language at or about the time of making the statement is clearly competent for that purpose.'' See also *The State v. Elliott*, 45 Iowa, 486 ; *Commonwealth v. Cooper*, 5 Allen, 494 ; *Goodall v. State*, 1 Ore. 333 ; Roscoe, Crim. Ev. 35.

Other objections were made to the rulings of the court, but we discover no prejudicial error in them, nor do they require special consideration. For the errors mentioned the judgment will be reversed and the cause remanded for a new trial.