## FRED WRATISLAW *et ux.* v. STATE.

No. A-3132—Opinion Filed Jan. 4, 1921.

(194 Pac. 273.)

(Syllabus.)

1.  **HOMICIDE—Dying Declarations.** Where a written dying de-
    claration, for the admission of which in evidence a proper predi-
    cate has been laid, contains recitals of transactions had and
    statements made which do not shed light upon the homicide and
    are not **res gestae** in the strict sense, such recitals of transac-
    tions and statements are not admissible in evidence.

2.  **TRIAL—Exclusion of Dying Declarations.** Where a written
    dying declaration contains matter that is admissible in evi-
    dence and also matter that is objectionable, it is not error to
    overrule a motion to exclude such entire declaration.

3.  **HOMICIDE—Objections to Dying Declarations—Requisites.**
    Where a written dying declaration contains matter that is ad-
    missible and also contains matter that is objectionable, the
    objector must specifically point out the parts that are objection-
    able, and not make a general objection to the entire declaration,
    if it is desired to have the exception to the ruling of the court
    available on appeal.

4.  **SAME—Erroneous Admission in Evidence—Reversal.** It is re-
    versible error for the court, where a written dying declaration
    contains matter that is admissible in evidence, and also con-
    tains matter that is objectionable, and which objections are spe-
    cifically pointed out by an objector, to admit such entire declara-
    tion in evidence, where the objectionable matter is prejudicial
    to the substantial rights of the defendant.

*Appeal from District Court, Jefferson County;*

*Cham Jones, Judge.*

Fred Wratislaw and Martha E. Wratislaw were con-
victed of manslaughter in the second degree, and they
appeal. Reversed and remanded, with instructions.

*Bridges & Vertrees,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst.. Atty. Gen., for the State.

ARMSTRONG, J.    The plaintiffs in error, Fred Wratislaw and Martha E. Wratislaw, were, together with Alcie Waldon, informed against jointly for the murder of C. J. McCarty.   Alcie Waldon was tried separately, convicted of manslaughter in the first degree, and his said. conviction recently affirmed by this court.   The said plain-- tiffs in error, hereinafter styled defendants, were tried jointly, convicted of manslaughter in the second degree, and each sentenced to imprisonment in the penitentiary at McAlester for four years.   To reverse the judgment ren-- dered, they prosecute, jointly, this appeal.

The evidence in this case is very voluminous and has. not been, as required by the rules of this court, abstracted in defendants' brief.   We deem it unnecessary to incumber this opinion by a detailed statement thereof and will only state such parts of the evidence as we deem necessary to an intelligent understanding of the case, from the court's viewpoint.

The uncontradicted material evidence is:   That on. the 31st day of January, 1916, Alcie Waldon, who was the son and stepson respectively of the defendants, shot O. J. McCarty in the town of Ringling, in Jefferson county, Okla., who from the effects of the wounds so inflicted died in June, 1916; that the said Alcie Waldon was tried for the homicide, convicted of manslaughter, and sentenced to imprisonment in the penitentiary for 30 years; that for about one year prior to the said homi-- cide the defendants had resided in New Mexico, to where

they had gone from Oklahoma, and from where they had returned to near Ringling, Okla., a few days before the homicide, doing so in compliance with a request so to do contained in a letter written by request of deceased to Mrs. Wratislaw, one of the defendants, and that on the day of the homicide, and prior to the homicide, the defendants and Alcie Waldon came together in a wagon to Ringling; that Fred Wratislaw, one of the defendants, was not present at the scene of the homicide, and that neither one of said defendants took any active part in said homicide; that the deceased kept a small store about 4½ miles from Ringling; that on Thursday preceding the shooting of deceased on Monday Alcie Waldon and his brother and the defendants went to the store of the deceased, where the deceased at the time was, remained there some time, and, together with the deceased, went from said store to a law office in the town of Ringling, and there the deceased executed to Martha E. Wratislaw, one of the defendants, a deed to certain lands and a bill of sale for some live stock, which said deed was left in the said office to be sent to the wife of the deceased, who was in Texas, to be executed, and a letter was written by deceased to her requesting that she execute the said deed; that the day after executing the said bill of sale the deceased caused to be issued a warrant for the arrest of the defendants and the said two stepsons of Fred Wratislaw for robbery, they having, since the execution of the said bill of sale, acquired possession of the said live stock; that the said Fred Wratislaw was arrested and held to bail on said charge on Saturday preceding the homicide on Monday; and that the deceased also instituted an action of replevin against them to recover said live stock.

The state proved the execution of an instrument of writing by the deceased, and that he was conscious and recognized that he was in *articulo mortis* when the same was read over to, approved and executed by him, and offered said document in evidence as the dying declaration of the deceased. The said instrument of writing is as follows:

### "State's Exhibit 1.

"Dying statement made by C. J. McCarty on June 25, 1916, at the farm of C. C. Ross, about four miles north of Krebs, in Pittsburg county, Okla., said statement being made in the presence of Carl Monk, county attorney of Pittsburg county, Okla., H. S. Cabell, district court stenographer, Fourth judicial district, state of Oklahoma, and in the presence of Mrs. Lottie Ross, Mrs. Ann McCarty, C. C. Ross, and D. Peacock.

"Statement: I realize that I cannot live and appreciate the fact that death is impending and bound to occur in a very short time. I have no hopes at all of living. My death will be caused by pistol wounds inflicted by a pistol in the hands of Aulcie Walden on January 31, 1916, at Ringling, Okla. The constable, George Simon, was present when I was shot. There was also a number of other people close by. There was nothing said to me out on the street on Monday by Aulcie Walden when he shot me. The first I knew of his being anywhere around me on Monday was when he fired the first shot at me, which struck me below the right collar bone and knocked me down. I do not remember hearing any other shots after the first shot, but I was also shot at the same time between the fourth and fifth rib on the left side, and also through the fleshy part of the upper left arm. I had a pistol in my overcoat pocket at the time I was shot, but did not use or attempt to use the same at all. I made no threats or advance or demonstration against

Aulcey Walden when he shot me. On Thursday preceding the shooting on Monday Aulcey Walden and Hickman Waldron came to my house, and Aulcey asked me to go down to the store and sell him some tobacco. The three of us went to the store, about 250 yards away. Before we got to the store, Martha E. Wratislaw and Fred Wratislaw came in the store, and we were talking about the cold weather. Mrs. Wratislaw wanted to know if I was going to settle up with her and pay her what I owed her. But that time Fred Wratislaw drew a pistol on me and said to me, 'By God, now don't deny anything she says; we come to settle up and want to know if you are going to give a deed to this land.' I told them I would give the deed. Aulcey went to get a notary and bring him to the store, but couldn't get any on account of the bad weather. Then Fred, Aulcey, and Mrs. Wratislaw took me in their buggy and made me go with them to Ringling. They took me to Brooks & Elder's office in Ringling. Mr. Elder drew the deed at their suggestion, and I signed it and also a bill of sale to three mules and a mare at their demand. All the time I was doing this I noticed that Fred Wratislaw kept his hand on his gun in his pocket. On the way to Ringling Mrs. Wratislaw said to me that if I ever told what they had said and done to me in the store or in Brooks & Elder's office that they would kill me. She said it was all settled satisfactory now if I did what they demanded, and if I said anything about it they would kill me, and Fred Wratislaw spoke up and said, 'Yes; you might as well have your black box ready.' After they left I told Mr. Elder what they had done and told him not to deliver the deed and bill of sale and letter, and then I tried to get an officer to arrest them. They were arrested on Saturday morning, January 29, 1916, after I signed the deed. I never saw them any more until I saw them at the office of the J. P. in Ringling on the Saturday they were arrested. On Sunday Aulcie and Hickman came by my house, but I did not speak to them. They sent for me to come out, but they left

when I went out. On Monday when I was shot I had gone to Ringling and had gotten out papers to replevy my mules and mare. Ringling is about 4½ miles from my store. I never saw any of them but Aulcey on the Monday I was shot and I didn't see him except just as a flash when he shot me. I was crossing the street when I was shot. While we were in Brook & Elder's office, Fred and Mrs. Wratislaw told him to write a letter to my wife in Milford, Tex., requesting her to sign the deed, and then she and Fred made me sign the letter. After I· told Mr. Elder about what had been done, I asked him to also hold this letter and not to mail it. I told him to keep the deed and letter and bill of sale. At· the time I make this statement, 4 o'clock p. m., I am perfectly conscious and in my right mind, not at all delirious nor under the influence of any drug, and I request all of the present, as named above, to sign and witness this my dying declaration.

"At the store on Thursday Fred Wratislaw told me to be gone from the country in two days.

"After this statement was written out it was read to me in the presence of the parties whose names are signed hereto, and I sign the same by mark, being unable to write on account of an afflicted hand.

his<br>
."O. J. X McCarty.<br>
mark

"Witnesses: Carl Monk, Henry S. Cabell, Mrs. Lettie Ross, Ann McCarty, C. C. Ross, C. D. Peacock."

The defendants objected to the said written statement being admitted in evidence as the dying declarations of the deceased—

"for the reason that the same has not been properly proved to be a dying declaration, and that there has not been sufficient predicate proven to warrant the same

being admitted as a dying declaration; (2) that said dying declaration is incompetent in that it relates almost entirely to matters transpiring four days before the homicide and is therefore inadmissible as a dying declaration; for the further reason that the said dying declaration contains conclusions and statements pertaining to separate transactions. having no relation whatever with the homicide, and statements made outside the presence of any person sought to be connected with the homicide; and for the further reason that no conspiracy has been shown to exist and therefore the same is incompetent at this time."

Thereupon the state asked that the defendants be required to state what part of said dying declarations relates to conclusions, and the court said that, "if there is any special portion of it you desire to call to the attention of the court, you may do so as it is read." Thereupon counsel for the defendants called the court's attention to the entire document, "and especially to that part of the same that refers to transactions occurring at the deceased's store prior to the homicide, and to statements made in Brooks & Elder's office prior to the homicide." The court overruled the said objections of the defendants and admitted in evidence the said entire written statement as the dying declaration of the deceased, to which the defendants and each of them duly excepted.

We think that a proper predicate was laid for the admission of said written instrument as the dying declarations of the deceased, and in the absence of the defendants specifically pointing out the objectionable matter therein, if any, the court did not err in overruling the motion to exclude as evidence the entire declarations.

"In objecting to the admission in evidence of certain

parts of a dying declaration counsel should point out the particular parts that he considers objectionable, and not a mere general objection to the entire declaration, if he desires to have the exception to the ruling of the court available on appeal." 1 R. C. L. p. 531, §72.

"A written dying declaration contains matter that is admissible, and other matter not admissible, because hearsay. There is a general objection to the admission of the paper and one item thereof, but no specific objection to matter of hearsay. It was the duty of the objector to specify the objectionable matter, and there is no error in overruling the objection to the admission of the paper for such hearsay." *West Va. v. Hood*, 63 W. Va. 182, 59 S. E. 971, 15 L. R. A. (N. S.) 448, 129 Am. St. Rep. 964.

The defendants, having afterwards been given an opportunity by the court to specifically point out the parts of said dying declaration which they thought objectionable, pointed out as objectionable the recitals in said dying declaration as to what occurred in the store of the deceased, and in the office of Brooks & Elder, on Thursday prior to the Monday on which deceased was killed. We are of the opinion that the court should have excluded the said recitals specifically pointed out, as they were of antecedent transactions to the time of the homicide, not immediately connected with the killing, not *res gestae* in a strict sense, and should have admitted in evidence the remaining part of said dying declaration.

"It is a rule of general application that statements of facts and circumstances not immediately connected with the act of killing, but relating to previous distinct transactions, are not admissible as dying declarations; for declarations which relate to such transactions do not come within the principle of necessity on which such declarations are received. Therefore dying declarations by the

injured party as to previous threats made by the accused, or as to previous attempts made on the declarant's life by the accused, are not admissible, for the declarant does not become a general witness. He can only speak of the transaction which caused the death, and such accompanying acts, statements, and conduct as shed light on it—the *res gestae,* in a strict sense. Anything previously done or said, unless called up and made a part of the altercation, cannot be proved as a dying declaration; and when so called up it can be proved as such only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement done or uttered at the time of the final fatal encounter and catastrophe, and which tend to shed light on it as a part of the *res gestae,* which can be so proved. If the rule admitting dying declarations can be extended to a separate and distinct act occurring half an hour before, it will extend to any act done the day before, or a week, month, or year. As soon as the limit fixed by absolute necessity is passed, the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible, not merely to prove the act of killing, but to make every homicide murder by proof of some old grudge. But is has been ruled that dying declarations as to prior threats are admissible where such threats are obviously and intimately connected with the homicide." 1 R. C. L. p. 434, § 78, and the authorities therein cited.

"The rule is well settled and safety to the meting out of justice requires that it should remain so—that a statement relating to former or distinct transactions is inadmissible. The declaration must be confined to the circumstances of the death." *Chittenden v. Com.,* 9 S. W. 386, 10 Ky. Law Rep. 330.

Dying declarations will not be admitted in evidence where they relate to matters antecedent or subse-

quent to the transaction which was the cause of death.
*Perry v. State,* 102 Ga. 365, 30 S. E. 903; *Binns v. State,*
46 Ind. 311; *State v. Perigo,* 80 Iowa, 37, 45 N. W. 399;
*State v. O'Shea,* 60 Kan. 772, 57 Pac. 970; *Peoples v. Com.*
87 Ky. 487, 9 S. W. 509, 810, 10 Ky. Law Rep. 523; *Lip-
scomb v. State,* 75 Miss. 559, 23 South. 210, 230; *State v.
Draper,* 65 Mo. 335, 27 Am. Rep. 287; *Medina v. State,* 43
Tex. Cr. R. 52, 63 S. W. 331; *State v. Moody,* 18 Wash.
165, 51 Pac. 356.

"Dying declarations are admissible to prove what was
done at the time * * * of the unlawful act which caused
death, but they are not admissible to prove what occurred
before or afterwards. * * * They are not competent for
the purpose of proving what occurred anterior to the
time the act which produced death was done. * * * Mat-
ters which do not form part of the *res gestae* are not
provable by dying declarations. The rule is confined to a
statement of the circumstances connected with the fatal act
and forming part of the same transaction. It is quite well
settled that what occurs before or after the act has been
done does not constitute a part of the *res gestae,* although
the interval of separation may be very brief." *Mont-
gomery v. State,* 80 Ind. 338, 41 Am. Rep. 815.

In *Sullivan v. State,* 102 Ala. 135, 15 South. 264, 48
Am. St. Rep. 22, it is held:

"Dying declarations are exceptional testimony, and
are received from the necessity of the case; the circum-
stances and the solemn surroundings being treated as sup-
plying the sanction and restraining force over the declar-
ant, which a solemn oath imposes in ordinary cases. But
the declarant does not become a general witness. He can
only speak of the transaction which causes the death, and
such accompanying acts, statements, and conduct as shed
light on it—the *res gestae,* in a strict sense. Anything
previously done or said, unless called up and made a part

of the altercation, cannot be proved as a dying declaration; and, when so called up it can be proved as such only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement done or uttered at the time of the final, fatal encounter and catastrophe, and which tend to shed light on it as a part of the *res gestae,* which can. be so proved"—citing *Fonville v. State,* 91 Ala. 39, 8 South. 688; *Bibb v. State,* 94 Ala. 31, 10 South. 506, 33 Am. St. Rep. 88; *Johnson v. State,* 102 Ala. 1, 76 South. 99.

"It is error [for the court] to admit as evidence, in a trial for homicide, the dying declarations of the victim to the effect that two weeks before the perpetration of the deed the defendant had made threats against his life, because such threats constitute no part of the *res gestae,* and the admission of the dying declarations should be restricted thereto." *Merril v. State,* 58 Miss. 65.

"Dying declarations as to the facts immediately attending the act of killing and constituting the *res gestae* are admissible, but declarations as to matters occurring anterior or subsequent to the act are inadmissible." *State v. Kelleher,* 224 Mo. 145, 123 S. W. 551, 19 Ann. Cas. 1270.

In said case it is said:

"The proposition now under consideration was sharply presented to this court in *State v. Parker,* 172 Mo. 191, 72 S. W. 650. In that case, as in the case at bar, objections were interposed to certain portions of the dying declarations, and this court, speaking through Judge Grant, very clearly and correctly announced the well-settled rules applicable to the admission of dying declarations. In treating of the proposition in that case, it was said: 'We are thus brought to the objection that portions of this statement were incompetent, because it was not confined.

and restricted to the identification of the accused and the deceased, * * * and the circumstances immediately attending said act and forming a part of the *res gestae.* Dying declarations are admissible as to those facts and circumstances constituting the *res gestae* of the homicide, but as to all other matters occurring anterior to the killing, and not immediately connected with it, they are incompetent"—citing *State v. Vansant,* 80 Mo. 76.; *State v. Bowles,* 146 Mo. 16, 47 S. W. 892, 69 Am. St. Rep. 598; *State v. Parker,* 96 Mo. 392, 9 S. W. 728; 1. Greenleaf on Evidence, § 156.

In *State v. Shelton,* 47 N. C. 350, 64 Am. Dec. 587, it is held:

"Dying declarations must be restricted to the act of killing and the circumstances immediately attending the act and forming a part of the *res gestae.*"

In *State v. Shelton,* supra, it is said:

The evidence "is * * * restricted to the act of killing and the circumstances immediately attending the act and forming a part of the *res gestae.* If it can be extended to a separate and distinct act, occurring half an hour before, it will extend to any act done the day before, or a week, month, or year. As soon as the limit fixed by absolute necessity is passed, the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible not merely to prove the act of killing, but to make every homicide murder by proof of an old grudge. That the exception is restricted in the manner above stated, is clear from the reason of the thing, and is settled by authority"—citing 1 Greenleaf, § 156, and cases there cited; Phillips on Evidence, pt. 1610.

That dying declarations are only admissible as to the actual facts which point distinctly to the cause of and the circumstances immediately producing and attending

the homicide, the *res gestae*, in a strict sense is also held in the following cases: *McLean v. State,* 16 Ala. 672; *Oliver v. State,* 17 Ala. 587; *Johnson v. State,* 17 Ala. 618; *Mose v. State,* 35 Ala. 421; *Johnson v. State,* 47 Ala. 9; Id. 50 Ala. 456; *Faire v. State,* 58 Ala. 74; *Reynolds v. State,* 68 Ala. 502; *Sylvester v. State,* 71 Ala. 17; *Pulliam v. State,* 88 Ala. 1, 6 South. 839; *Kirby v. State,* 89 Ala. 63, 8 South. 110 *Blackburn v. State,* 98 Ala. 63, 13 South. 274; *Allen v. State,* 70 Ark. 337, 68 S. W. 28; *People v. Taylor,* 59 Cal. 640; *People v. Fong Ah Sing,* 70 Cal. 8, 11 Pac. 323; *People v. Wong Chuey,* 117 Cal. 624, 49 Pac. 833; *McBride v. People,* 5 Colo. App. 91, 37 Pac. 953; *United States v. Heath,* 9 Mackey (D. C.) 272; *Savage v. State,* 18 Fla. 909; *Richard v. State,* 42 Fla. 528, 29 South. 413 (implied); *Parks v. State,* 105 Ga. 242, 31 S. E. 580; *North v. People,* 139 Ill. 81, 28 N. E. 966; *Boyle v. State,* 105 Ind. 459, 5 N. E. 203, 55 Am. Rep. 218; *Archibald v. State,* 122 Ind. 122, 23 N. E. 758; *State v. Baldwin,* 79 Iowa, 714, 45 N. W. 297; *State v. O'Shea,* 60 Kan. 772, 57 Pac. 970; *Walston v. Com.,* 16 B. Mon. (Ky.) 16; *Leiber v. Com.,* 9 Bush (Ky.) 11; *Pace. v. Com.,* 89 Ky. 204, 12 S. W. 271; *Starr v. Com.,* 97 Ky. 193, 30 S. W. 397; *Luker v. Com.,* 5 S. W. 354, 9 Ky. Law Rep. 385; *Owens v. Com.,* 58 S. W. 422, 22 Ky. Law Rep. 514; *State v. Black,* 42 La. Ann. 861, 8 South. 594; *People v. Olmstead,* 30 Mich. 431; *Payne v. State,* 61 Miss. 161; *State v. Jefferson,* 77 Mo. 136; *State v. Chambers,* 87 Mo. 406; *State v. Parker,* 96 Mo. 382, 9 S. W. 728; *State v. Sexton,* 147 Mo. 89, 48 S. W. 432; *Binfield v. State,* 15 Neb. 484, 19 N. W. 607; *People v. Davis,* 56 N. Y. 95; *State v. Harper,* 35 Ohio St. 78, 35 Am. Rep. 596; *State v. Garrard,* 5 Or. 216; *Com. v. Gumpert,* 6 Luz. Leg. Reg. (Pa.) 187; *Com. v. Murray,* 2

*Ashm.* (Pa.) 41; *Com. v. Keane,* 7 Pa. Super. Ct. 293; *State v. Johnson,* 26 S. C. 152, 1 S. E. 510; *State v. Bradley,* 34 S. C. 136, 13 S. E. 315; *State v. Banister,* 35 S. C. 290, 14 S. E. 678; *State v. Faile,* 43 S. C. 52, 20 S. E. 798; *Nelson v. State,* 7 Humph. (Tenn.) 542; *Warren v. State,* 9 Tex. App. 619, 35 Am. Rep. 745; *Ex parte Barber,* 16 Tex. App. 369; *State v. Kessler,* 15 Utah, 142, 49 Pac. 293, 62 Am. St. Rep. 911; *State v. Carrington,* 15 Utah, 480, 50 Pac. 526; *State v. Center,* 35 Vt. 378; *Crookham v. State,* 5 W. Va. 510; *State v. Cameron,* 2 Chand. (Wis.) 172; Id., 2 Pin. (Wis.) 490; *State v. Dickerson,* 41 Wis. 299; *Rex. v. Hutchinson,* 2 Barn. & C. 608; *Reg. v. Hind,* 8 Cox, C. C. 300; Bell, C. C. 253; 29 J. M. C. (N. S.) 147; 6 Jur. (N. S.) 514; 2 L. T. (N. S.) 253; 8 Week. Rep. 421; *Rex v. Mead,* 4 Dowl, & R. 120, 2 Barn. & C. 605, 26 Revised Rep. 484; *Ashton's Case,* 2 Lewin C. C. 147.

In *Mulkey v. State,* 5 Okla. Cr. 75, 113 Pac. 532, it is held:

"Dying declarations must be restricted to facts concerning the cause and circumstances immediately attending the homicide, and forming a part of the *res gestae,* and must relate to facts, and not to mere conclusions or matters of opinion or belief."

"In *Mulkey v. State, supra,* Judge Doyle says:

"The rule that dying declarations should be confined to facts concerning the cause and circumstances of the homicide is one that should not be relaxed. It must be remembered that this kind of testimony is classed as hearsay evidence and is admitted under an exception to the general rule from considerations of public necessity. It is not under the sanction of an oath, and there is no opportunity for cross-examination. It overrides the sacred

constitutional right of an accused to be confronted with the witness against him. It is also subject to the special objection that such declarations are usually made when the declarant is in the last stage of physical exhaustion, with mental powers impaired to a greater or less extent. It leaves entirely out of consideration the fact that passions and prejudices, which in life pervert the perceptive faculties, do not always lose their power on the deathbed. Such evidence is also liable to be incomplete. The victim may naturally be disposed to give only a partial account of the occurrence, although possibly not influenced by animosity or ill will. All these objections are overcome by the one consideration of public necessity that society may not be deprived of the testimony, such as it is, and whatever it may be worth."

Applying the rule as fixed by the very many citations of authority herein cited, as to which rule we have been unable to find an authority to the contrary, "that acts which occur and threats made prior to the commission of a homicide, and not done or made at the time of the fatal encounter, cannot be proved by dying declarations," and the court committed prejudicial error in admitting in evidence that part of said dying declarations which recited that which occurred at the store of the defendant and the statements made in the office of Brooks & Elder on Thursday prior to the Monday on which the homicide was committed.

Among the other instructions given, the court instructed the jury:

"If, upon consideration of all the evidence detailed in the trial of the case, you find beyond a reasonable doubt that the deceased came to his death by the procurement or culpable negligence of the defendants, under circumstances that do not make them guilty of murder or man-

slaughter in the first degree, you should find the defendants guilty of manslaughter in the second degree."

This instruction, under the undisputed evidence in this case, does not correctly instruct the law, and while this instruction was not excepted to, and was more favorable to the defendants than they were entitled to, and hence not prejudicial to them, we have, in view of the fact that such erroneous instruction may work a mistrial of justice in another trial of the case, thought best to direct attention to said improper instruction, that said error may not again occur.

Section 2332 defines manslaughter in the second degree as follows:

"When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, provided that no undue advantage is taken nor dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

In this case the undisputed evidence is that the homicide was committed with a dangerous weapon per se, a pistol, and therefore the instruction that the jury might find the defendants guilty of manslaughter in the second degree was entirely unwarranted, and should not have been given. Where the killing is with a deadly weapon, as in the instant case, and there is no pretense that the killing was accidental, no issue of manslaughter in the second degree is presented. *Ballard v. State,* 12 Okla. Cr. 277, 154 Pac. 1197.

As the error pointed out must cause a reversal of the judgment rendered, we, in view that another trial of the case may be had, will not discuss, other than we have, the evidence in the case.

The judgment of the trial court is reversed, and the cause remanded, with instruction to grant the defendants another trial.

DOYLE, P J., and MATSON, J., concur.