# CASES DETERMINED

## January Term, 1911.

HEDGER, Plaintiff in error, vs. THE STATE, Defendant in
error.

*September 17, 1910—January 10, 1911.*

CRIMINAL LAW: HOMICIDE. (1–13) *Evidence: Sufficiency: Compe-
tency: Curing error by striking out: Uxoricide: Relations be-
tween spouses: Habits of accused: Immaterial errors: Result of
inquest: Unlawful search by police.* (14–17) *Jury discharged
after trial begun: Jeopardy: Challenge to juror: Discretion.*
(18–25) *Instructions to jury: Degrees of murder: Malice: In-
tent to kill: Reasonable doubt: Motive: Contradictory testimony:
Presumption of honest mistake: Weight of answer to hypothet-
ical questions: Reputation: Double negative.* (26, 27) *New
trial: Newly discovered evidence.*

1. Circumstantial evidence from which the jury might have con-
cluded that the wife of the accused was murdered by shooting
in their residence, about 7:45 a. m., when he and his wife were
the only persons in the house and at the time when a shot was
heard by the neighbors; that the accused was in the neighbor-
hood or at the house during the day; and that he knew of his
wife's death prior to the discovery of her body in the evening
by another person, but failed to disclose the fact or give any
alarm, is *held* sufficient to support a verdict of guilty.

2. Error in admitting evidence is cured by striking it out and di-
recting the jury to disregard it, unless it affirmatively appears
that the accused was nevertheless prejudiced thereby.

3. In cases of uxoricide great latitude of inquiry is permissible with
respect to the relations existing between the spouses prior to
the killing.

4. In such a case evidence that accused was frequently intoxicated

and that his health was impaired thereby, and describing his eccentricities and peculiarities and his general deportment, was admissible.

5. Testimony of one from whom the accused sought a loan to be secured by mortgage on his homestead, to the effect that he informed the accused that the wife of the latter refused to sign the mortgage, was competent.

6. Where evidence on the part of an accused is offered tending to show that a third person displayed alarm and feared he might be charged with the offense on account of something that occurred in the trial, the state may rebut the inference that this arose from a guilty conscience by proving that the prosecuting attorney suggested to such third person that counsel for the accused might charge him with the murder.

7. There was no error in permitting a witness for the state to testify to the number of strangers using the alley adjoining the house in which the murder was committed, by comparison with the number using other similar alleys.

8. It was within the discretion of the court to permit a witness for the state to testify to financial transactions between himself and the accused after the murder, and such testimony was not incompetent because it tended to show that the accused had money after his arrest.

9. Testimony that the accused mortgaged his homestead to raise money to defray expenses of his trial is *held*, though irrelevant and immaterial, not to have been prejudicial.

10. Testimony as to conversations between witnesses as to the duty of every citizen forthwith to report to the police any information they might have concerning the commission of the crime of murder, was irrelevant and immaterial, but was not prejudicial.

11. Where the prosecution seeks to establish that certain witnesses heard a shot at a stated time, it is competent to prove that these witnesses remarked to one another at the time that the sound heard was a shot.

12. In a prosecution for murder the verdict of a coroner's jury given in an inquest upon the body of deceased, to the effect that the death was caused by some person or persons unknown, is not competent evidence on behalf of the accused.

13. Evidence tending to show that police officers acted without authority in searching the premises of the accused and seizing his personal property, is not competent unless some of the property or papers so seized are offered in evidence on the part of the state and objection is made on the ground that the instruments of evidence so offered were procured in this unlawful way.

14. Where it is discovered, after the jury is accepted and the trial

in progress, that one of the jurors is not impartial, has formed and expressed an opinion in the case, and has testified falsely on the *voir dire*, the court may discharge the jury, impanel another, and begin the trial anew; and the accused will not thereby have been twice put in jeopardy.

15. This power of the court rests upon the ground of necessity, like the case of sickness or death of a juror or that of the presiding judge. It is absolutely necessary to discharge the first jury under such circumstances and begin anew in order to have a trial of the cause which is a trial and not a farce.

16. This power of the court cannot be exercised for its own convenience or in discretion, and can be exercised only in cases in which the law recognizes and points out the necessity for such action.

17. Sustaining the challenge of the prosecution to a juror is a matter largely within the discretion of the trial court, and its finding that the juror is not impartial is conclusive upon the appellate court, if there is evidence to sustain it.

18. The instructions to the jury must be tested in view of the questions before the court arising upon the information and evidence, and not academically or by contrast with the whole body of the law relating to homicide.

19. So tested, the charge in this case relating to implied malice and to the intent to kill which constitutes the "premeditated design" of murder in the first degree, is *held* not erroneous.

20. A charge that the reasonable doubt which entitles an accused person to an acquittal is the doubt of guilt reasonably arising from all the evidence in the case, was not, in view of its context, erroneous as excluding the right to an acquittal by reason of reasonable doubt arising from lack of evidence.

21. A charge to the effect that existence of a motive is not essential to a conviction for murder, but presence or absence of it is an evidentiary circumstance merely bearing, with more or less weight according to the circumstances, on the question of guilt, was not erroneous.

22. A charge that if there is a conflict in the testimony of witnesses "the presumption is that either one or the other of the witnesses may be honestly mistaken, rather than that either wilfully testified falsely," was not misleading or prejudicial to the accused, although technically that is not a presumption of law.

23. A charge to the effect that in weighing the answers of experts to hypothetical questions the facts stated in such questions should be kept in mind, and if not the same in material respects as the facts which the jury found to exist such opinions of the experts would be necessarily weak if not valueless, was correct.

24. A charge that "evidence of good reputation or good character

does not constitute a defense," was not erroneous or misleading when considered in connection with the whole charge on that subject, showing in what sense the word "defense" was used and understood.

25. A mere slip of the tongue causing a double negative is not always understood by ordinary people as an affirmative, and such mistake in a charge will not suffice for a reversal where the same proposition was many times stated correctly in the same charge and it is apparent the accused was not prejudiced by the error.

26. On a motion for a new trial on the ground of newly discovered evidence the motion may be denied if the trial court is convinced upon proper evidence that there is no reasonable probability that another jury, having before it all the former evidence together with the newly discovered evidence, would come to a different conclusion from that arrived at by the former jury.

27. In a case where the newly discovered evidence consisted of the testimony of a witness on a relevant and material point, but the witness was examined and cross-examined and therein his sanity, his veracity, and his general character were impeached by himself and others, the court may, upon the ground stated, deny the motion for a new trial.

ERROR to review a judgment and an order of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

For the plaintiff in error there were briefs by *Kronshage, McGovern, Goff, Fritz & Hannan,* and oral argument by *G. D. Goff, F. E. McGovern,* and *T. J. Hannan.*

For the defendant in error there were briefs by the *Attorney General, Chas. A. A. McGee,* district attorney, and *Norman L. Baker,* assistant district attorney, and the cause was argued orally by *Russell Jackson,* deputy attorney general, and by *Mr. McGee* and *Mr. Baker.*

The following opinion was filed October 25, 1910:

TIMLIN, J.    *Ward E. Hedger* was found guilty of the murder in the first degree of his wife, Louise J., committed on September 9, 1909. On February 7, 1910, he was sentenced to imprisonment in the state prison for the full period

of his natural life.   After judgment and sentence he moved
for a new trial upon newly discovered evidence, and his mo-
tion was denied.   He brings his cause to this court for re-
view upon a writ of error to the judgment and sentence of
conviction, and a separate writ of error to the order after
judgment denying him a new trial.   Under the first men-
tioned writ he assigns fifteen errors.   The first, twelfth,
thirteenth, fourteenth, and fifteenth go to the sufficiency of
the evidence to support the conviction, and these will be con-
sidered together.

The accused and his wife had been married upwards of
twenty years, had no children, and at the time of her death
she was something over forty and he about fifty years of age.
He owned a homestead at No. 1219 Cedar street in Milwau-
kee, where they resided, and some other property, and he car-
ried on a dress-plaiting business at No. 105 Grand avenue,
about seven minutes' ride on the street cars from a point at
the intersection of Eleventh and Wells streets, two and one-
half squares distant from his homestead.   They leased a fur-
nished room or rooms in their residence and were reputed
thrifty, respectable people of moderate means.   Accused was
somewhat though not excessively addicted to the use of intox-
icating liquor, and while his wife manifested some dissatis-
faction on this ground their domestic relations were ap-
parently ordinarily harmonious.   Two young men had a
room in the house, a Mr. Peterson, who was at the time of
Mrs. Hedger's death temporarily out of the state, and a
Mr. Conrad, who left the Hedger residence at seven o'clock
and twenty minutes on the morning of September 9, 1909,
and did not return until the evening of that day after the
discovery of Mrs. Hedger's dead body.   One Iver Harrang,
who formerly roomed in the Hedger house, was at the time in
question a medical student in his senior year and obliged to
earn money to carry him through college.   He was appar-
ently practicing rigid economy and worked as night watch-

man from about 7 p. m. to 7 a. m. upon a viaduct in course
of construction at a distance from the Hedger house. He
was in ill health, had incipient tuberculosis, influenza, and
a disordered stomach. He was in the habit of calling every
evening about 6 o'clock, on his way to work, at Hedger's for
a lunch to be eaten by him at midnight on his work. This
lunch included a bottle of coffee and was prepared for and
given to him by Mrs. Hedger gratuitously, and he had $70
in money which he left with Mrs. Hedger for safe keeping.
His relations with accused and with deceased were friendly.
He roomed on Twelfth street, a short distance north of its
intersection by Cedar street. Cedar street runs east and
west. Wells street, having the street railway thereon, is one
block south of and parallel with Cedar street. Both are
crossed by Eleventh, Twelfth, and Thirteenth streets at right
angles, numbering from east to west, and No. 1219 Cedar
street is on the south side of Cedar street, faces north, and is
about midway between Twelfth and Thirteenth streets.
Next east of No. 1219 is an alley extending south from Cedar
street to Wells street. Between this alley and the Hedger
house, beginning at the lot line on Cedar street, is a wooden
rail supported by posts, which continues further back as a
board fence toward the rear of the Hedger lot. West of this
rail and fence and east of the Hedger house and between the
house and this rail and fence is a narrow private sidewalk on
the Hedger lot which extends from the public sidewalk on
Cedar street south to the rear of the house. The front or
north door of the Hedger house is near the northeast corner
of the house. It is reached only through and inclosed in a
storm shed which has but one door, which is on the east side
of the storm shed. From this last mentioned door three or
four steps lead down to the narrow private sidewalk. It is
only six or seven feet from these steps to the rail between the
private sidewalk and the alley. Thirty or thirty-five feet
further south along this same narrow sidewalk is the side

door to the Hedger residence, which opens into the kitchen. But this kitchen door is also inclosed by a storm shed having one door opening to the east and some steps ascending to it from this private sidewalk. Further south the private sidewalk takes a turn to the west around the southeast corner of the house, and a step or two west from this turn there rise from the walk a few steps which bring one on to the south end of the east porch of the house in which the side storm shed above mentioned is built, and also brings one to another door opening to the south and entering this same east storm shed. These three entrances are called by the witnesses the front, the side, and the rear entrance, but these terms are somewhat misleading. Entering the house by the front or north entrance there is first the storm shed, then the front door, then a hall with a parlor to the west, and south of this parlor a sitting room, east of the latter a dining room, and south of this is the kitchen, which is reached from the north by the door between it and the dining room and from the east by a door opening into the east storm shed. In the second story are bedrooms. East of the Hedger house and across the alley from it is the Omlor residence. West of the Hedger residence and extending from it to Thirteenth street and fronting on the last named street is the Waldeck barn and residence in the order named. South of the Waldeck residence and fronting on Thirteenth street but with its rear extending easterly to the rear of the Hedger lot is the nurse's boarding house occupied by Miss Casey, her domestic aide, and several professional nurses. The rear of the last mentioned house is sixty or seventy feet from the rear of the Hedger residence. The Kennedy flats are on the north side of Cedar street and between Eleventh and Twelfth streets. The significance of the evidence would be lost if these descriptive details were not kept in mind. They have been collected from the evidence and exhibits in this case with some labor.

On the morning of September 9, 1909, the accused and his

wife had breakfast together about 7:30 o'clock. Their breakfast consisted of coffee, rolls, bread, and boiled eggs. After breakfast accused left the house at such time that he would reach the corner of Eleventh and Wells streets, two and one-half squares distant, at 7:49 or 7:50 o'clock. Accused and his wife were the only persons in their house after 7:20 o'clock and up to the time of his leaving, about 7:45 or 7:47 o'clock. There was testimony which the jury had a right to believe, by four persons, two in the Waldeck house and two in the Casey house, that they heard a shot in the direction of the Hedger house at 7:45 o'clock. Some of them also heard following the shot a sound like falling dishes. Much criticism is made on this evidence, but its credibility was for the jury. The accused boarded the street car at the time stated, went down to his place of business, and it is vigorously contended that it has been shown by the testimony of various persons that he remained down town at or in the immediate neighborhood of his place of business all day and did not return to his residence until evening. There is testimony to support that conclusion had the jury so found. But the witness Malcolm McHarg testifies that he saw the accused about 10:30 or 10:45 o'clock in the morning of September 9th at the Kennedy flats in the neighborhood of the residence of the accused, and saluted him. A clerk at the drug store on the corner of Eleventh and Wells streets saw accused pass there at 2:30 p. m., and Mrs. Waldeck and her daughter, the next-door neighbors of the accused, saw him coming from the direction of his residence and passing the Waldeck residence going west on Cedar street toward Thirteenth street at about 2:10 p. m. on the same day. The accused left his place of business, 105 Grand avenue, at 5:30 p. m., and went directly home, and after alighting from the street car at or near the intersection of Eleventh and Wells streets stopped to purchase a bottle of milk and took it home with him, as was his custom. Whether from this point he

went home by going north on Twelfth and west on. Cedar street, or north on Thirteenth street and east on Cedar street, or up through the alley mentioned leading from Wells to Cedar street, is not shown. According to his admissions to the officers he did buy this milk on his way home, found the rear (east?) door locked, then set down his bottle of milk and went in the front door. After he entered he was informed by Iver Harrang, whom he first met inside the house, that his wife was on the kitchen floor dead, and he went back to the kitchen and felt of her forehead and hands and found them cold.

A different version of the occurrences at the Hedger residence at this time is given by Harrang. The latter left his rooms on Twelfth street five minutes before 6 o'clock, going south on Twelfth street and west on Cedar street to the Hedger residence with his coffee bottle to get his usual midnight lunch from Mrs. Hedger. He would thus face *Hedger* were the latter approaching Cedar street from Wells on Twelfth street, walk with him or near him were the accused proceeding west on Cedar street at this time, and would face *Hedger* coming east on Cedar street while Harrang was approaching the Hedger residence going west on Cedar street if *Hedger* had come up from Wells street by way of Thirteenth street or any other street west of Thirteenth street. Harrang proceeded west on Cedar street, passed the alley mentioned to the narrow sidewalk which ran by both the front and the side entrances to the Hedger house, considering the storm-shed doors the entrance doors. He turned south on the private sidewalk and went down to the east storm-door entrance and found it locked as *Hedger* had found it. He then observed a milk bottle standing on the porch near this entrance, and inferring from this that the Hedgers were at home he continued a few steps south on this private sidewalk, turned west thereon a step or two, ascended the steps leading therefrom to the porch, and entered the east

storm shed through the south door opening into the same.
He saw the mail scattered on the floor inside this door, the
kitchen door between the kitchen and this storm shed was
open, looked in and saw the body of Mrs. Hedger lying on
the kitchen floor, walked in and struck a match and held it
over her face, recognized Mrs. Hedger and called out, "Is
there anybody at home?" There was no answer, but almost
immediately he heard the front door "go," so he walked out
through the dining room and met *Mr. Hedger* where the
dining room joins the hall and said to him: "Do you know
about this, *Mr. Hedger?*" The latter answered: "That is
what I am trying to find out," or "That is what I have been
trying to find out." On their way back to the kitchen
*Hedger* said something about having tried to get a doctor.
Both lifted the table from over the body toward the east wall
and the accused sat down in a rocking chair by the south
window. Mr. Harrang then bent down and put his hand on
Mrs. Hedger's wrist and felt that it was cold and hard and
said to *Hedger:* "She is gone, *Mr. Hedger,* and she has been
gone for some time." Also, noticing the table, said: "It
looks as though she has been going to eat." *Hedger* said:
"Yes, or trying to prepare a meal for somebody." *Hedger*
did not touch the dead body of his wife. The room was
rather dark, the shade on the east window was all the way
down, and that on the south window was pulled down to about
eight or ten inches from the bottom sill. The body lay with
the limbs stretched out, hands along the side lying perfectly
straight, dress pulled up not quite to the knee, and the lower
half of the body under the table. There was a white table-
cloth on, a plate, a few slices of bread, a table knife, some
butter in a wooden tray, and a cup of coffee. The coffee was
covered with a scum and looked as if it had been standing
for a long time. Harrang then asked *Hedger:* "Did you get
a doctor?" and the latter answered "No." "Did you tele-
phone for one?" and the latter again answered "No." Har-

rang then declared he would go and get one and started out and called up Dr. Tisdale, came back again and went in the side door to the kitchen, and found *Hedger* sitting by the window in the same chair where he was when Harrang left. Then a doctor came, and in a few minutes another doctor and two or three ladies.

The evidence showed that the deceased came to her death by reason of a gunshot wound in the back of the head in such place and taking such direction as to preclude the idea of suicide, and a thirty-two caliber revolver bullet was at the autopsy found imbedded in the brain. There were no powder marks, and no pistol or other firearm could be found in the house after diligent search. There was a wound over the left eyebrow a half an inch or more in length, a quarter of an inch in width, and about a quarter of an inch in depth, but this was not the cause of death. Bureau drawers were pulled open and contents scattered on the floor, but although there was valuable jewelry and silverware in the house none of it was missing. The money which Mrs. Hedger was thought to have was not found. The indications were that the disorder was caused by someone who wished to give the house the appearance of having been burglarized. The accused did not attempt to ascertain whether anything was missing until after the police officers came into the house, when he aided somewhat in the search at their request. He tried to give the impression that there had been a burglary. The body was lying on the kitchen floor, feet to the southeast, head to the northwest with the head in a pool of blood, dressed in a long kimona and night dress, a suit of underwear, black skirt, and pair of stockings. There were no shoes or slippers upon her feet, and the body was removed to the morgue, where an autopsy was held about 10:15 o'clock the night of September 9th. There was found in the stomach a few particles of bread and pieces of white of egg. Of the contents of the stomach three fourths were fluid and one fourth solid.

The pieces of white of egg were unchanged by digestion, the lines of fracture sharply defined with angles intact, on the fractured surfaces the lines of coagulation were visible. From this and other data the doctors were of opinion that the contents of the stomach had been ingested not more than half an hour nor less than fifteen minutes before her death. Because the *rigor mortis* had passed, because of the dryness of the clotted blood, and because of the condition of the contents of the stomach, the doctors were of opinion that Mrs. Hedger had been dead twelve hours before the autopsy.

Evidence was offered bearing upon the demeanor of the accused when he boarded the street car about 7:50 o'clock that morning and also after the discovery of his wife's body, and there is evidence to the effect that at the latter time he cried or moaned, and also evidence going to show that he was not seriously affected, but indulged in jokes while sitting in the house waiting for the body to be removed to the morgue; did not attempt to touch the body of his dead wife or help to remove it, and rather persistently adhered to the theory that there had been a burglary and also to the suggestion that his wife had been probably preparing a meal for some tramp who shot her. Testimony was offered to show that *Hedger* had arrived in the neighborhood of his home shortly before 6 o'clock on the evening of September 9th and had gone to the entrance of the Kennedy flats, thus tending to make it appear that after leaving the bottle of milk on the side porch he had not gone directly to the front door, but had gone to a convenient place from which he could watch for the expected arrival of Harrang, and only entered his house after he had permitted Harrang to discover the body. The accused did not take the stand as a witness, and Harrang and he did not meet at or near the house at 6 o'clock after the accused says he left the bottle of milk on the side porch and proceeded to enter by the front door. No explanation of this is offered. There were circumstances here from which the jury were justified in finding that the accused arrived at

his residence before Harrang arrived, left the bottle of milk there, and did not immediately enter the house, but went somewhere and waited until Harrang had entered the house through the so-called rear entrance. It also appeared that the accused was short of funds, was pressed by his creditors, and was trying to mortgage the homestead to raise money, and that his wife had refused to sign the mortgage. Other facts and circumstances too numerous to be set forth here in detail, but more remote than those above set forth, appeared.

Counsel for the accused challenged the evidence as wholly circumstantial and therefore insufficient to exclude reasonable hypotheses other than the guilt of the accused. They argue that no motive for the murder is shown and the most that the evidence tends to establish is homicide with opportunity on the part of the accused to have committed it. We cannot agree with this argument. For the purpose of upholding the verdict the evidence sufficiently points to the conclusions, first, that a murder was committed; second, that it was committed at about 7:45 a. m. on September 9, 1909, in the Hedger residence, at a time when the accused and his wife were the only persons in that residence, soon after their breakfast, and at the time the shot was heard by the neighbors; third, that the accused was in the neighborhood of or at his house during the day of September 9th and failed to disclose the fact of her death or make any alarm; fourth, that the accused knew of the death of his wife prior to the discovery of her body by Iver Harrang and failed to disclose it. When the jury was satisfied by the evidence of the truth of these four propositions they had established facts and circumstances from which they might lawfully infer the guilt of the accused. *Lam Yee v. State,* 132 Wis. 527, 112 N. W. 425, and cases; *Lonergan v. State,* 111 Wis. 453, 87 N. W. 455; *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14; *Prinslow v. State,* 140 Wis. 131, 121 N. W. 637.

The assignments of error relative to the admission and

exclusion of evidence present, first, that the witnesses for the state were permitted to testify relative to the presence in the Hedger home of a bottle of chloroform labeled "Chicago," which was found there by Mrs. Hedger in the absence of the accused. The state attempted to prove what Mrs. Hedger said on finding the bottle, but this was erroneously ruled out on objection of the accused because not said in the presence of the accused. The evidence appears to have been attempted for the purpose of showing the relations between the spouses. But the court ordered the evidence already received stricken out and instructed the jury to disregard it. This power of the court to so rule is essential in the proper conduct of the trial, because it cannot always be seen or known when evidence is admitted whether this evidence can be logically connected with the case against the defendant. The rule of this court on that subject and the cases supporting it will be found in *Hanson v. Johnson,* 141 Wis. 550, 124 N. W. 506. It has not been shown in the case at bar that the accused was prejudiced by the admission of this evidence so far as it was admitted. There was no error in admitting evidence tending to show that the accused was addicted to the use of intoxicating liquor, was frequently intoxicated, and that his health was impaired thereby, nor that he was an eccentric and peculiar man, nor to describe his eccentricities or peculiarities or general deportment. In cases of uxoricide the relation between the spouses prior to the killing is proper to be shown, and, because of their disposition to conceal their differences from third persons and because of the desire sometimes existing to break the bond which has become hateful and yet holds them together, great latitude of inquiry is permitted in such cases. The relations of the spouses prior to the uxoricide becomes an important point of inquiry, and testimony relevant on that subject is admitted even though it tends to show the accused guilty of other offenses. 21 Cyc. 913, 916, 917, 918, and cases. It

is not an answer to this to say that the relations between the accused and his wife were shown to have been ordinarily harmonious.   The state had the right to attempt to prove the contrary.   Testimony regarding a disagreement between the accused and his wife in 1902 relative to the prosecution of their claim against the estate of Stolla was competent on this ground, but too remote to be of any value.   We cannot think the accused was prejudiced by its admission.   Over the objection of the accused testimony was received reporting a conversation over the telephone, a short time before the death of Mrs. Hedger, between the latter and one Gottschalk, to whom the accused had applied for a loan of $1,500 to be secured by mortgage on this homestead.   Mr. Gottschalk testified that he called up Mrs. Hedger at her house and that someone purporting to be Mrs. Hedger answered and refused to sign the mortgage.   He was not acquainted with Mrs. Hedger at the time and did not recognize her voice.   But it was further shown that Mr. Gottschalk informed the accused of this conversation by telephone and that the wife of accused refused to sign the mortgage.   The accused expressed some disappointment at the refusal and said: "Well then we will have to call it off."   The circumstances were strongly corroborative of the fact that this was Mrs. Hedger speaking to Mr. Gottschalk over the telephone, but we do not put the ruling on that ground.   The relevant fact to be established was that the accused had been attempting to mortgage the homestead and that he knew his wife refused to sign the mortgage, and these two facts are made to appear by the testimony of Mr. Gottschalk relating to transactions with the accused and by the testimony of Gottschalk that he informed the accused that he had communicated with Mrs. Hedger and that she refused to sign the mortgage.   The mortgage was never executed, and whether it was Mrs. Hedger who answered Gottschalk at the telephone from her house or not, the accused was informed that his wife had refused to sign the

mortgage and he acquiesced complainingly in this refusal, and the mortgage was not signed. The testimony was competent for the purpose of showing that the accused had been informed and probably knew that his wife refused to sign the mortgage. The cases cited by the plaintiff in error are not in point. It is not sought to charge Mrs. Hedger with any liability or any blame on account of this conversation over the telephone, but rather to show that her husband was informed that she refused to sign the mortgage, that he was put to some expense thereby and displeased, and he had opportunity, by reason of seeing his wife every evening, to ascertain whether the information given him by Mr. Gottschalk was correct or not. There was no error in permitting the witness Buelow to testify that, some months before the death of Mrs. Hedger, Mr. Harrang lost a revolver while running to a fire near the viaduct upon which he was employed as watchman, and we do not find from the record that he detailed conversations with the person who had broken the revolver by running over it with his automobile. Some slight evidence of this kind slipped in in an answer irresponsive to the question, but it was not persisted in nor called for by the prosecution and was quite immaterial.

It is next urged that the prosecution attempted by suggested questions and a display of rogue's gallery photographs of a private detective named Collins to convey to the jury the idea that Collins was in the employment of the accused at the time of the trial and that there was something dark and reprehensible connected with such employment. We do not find anything in the record to show that any such photograph was displayed to the jury. It certainly was not offered in evidence, and questions on the part of the prosecution to which our attention is called do not support the claim made by the accused. One Rogers was permitted to testify in regard to negotiations between him and the accused subsequent to the death of Mrs. Hedger concerning the sale of

*Hedger's* real estate in Wauwatosa for the purpose of raising money to enable him to defend this cause. It is said by the attorney general that this testimony was received without objection, and the record seems to bear him out in that statement. The testimony was quite remote and immaterial.

Error is assigned on the admission of the evidence of Mr. Baker, the assistant district attorney, who testified in rebuttal relative to a conversation between him and Harrang. While the accused was putting in his evidence one of his witnesses testified to an interview with Harrang in which the latter appeared concerned and excited over the effect of some evidence given in the case and feared the defendant's counsel would accuse him of the murder. The assistant district attorney testified that Harrang came to the city hall on that occasion at his request, that he was flushed, a little nervous and sick, and that he suggested to Harrang that the counsel for the accused would attempt to use this fact which had been developed to show the probability that Harrang was the guilty person. This was for the purpose of tending to establish that Harrang's anxiety on this point was not suggestive of a guilty conscience, but was the result of what the assistant district attorney had informed him. The evidence of the assistant district attorney was competent upon this point, because, although the state was not required to negative the guilt of Harrang, it might repel by proof any suggestions or impressions made by the testimony on the part of the defense tending in that direction. The error assigned on the testimony of the witness Mohr cannot prevail, because the testimony was stricken out and the jury instructed to disregard it and prejudice to the accused has not been made to appear. *Hanson v. Johnson,* 141 Wis. 550, 124 N. W. 506. There was no error in permitting the witness Omlor to testify to the number of strangers passing through or using the alley directly east of the Hedger house by comparison with the number using other similar alleys. It was within the discretion

of the court to permit the witness Trayser to testify to financial transactions between himself and the accused subsequent to the death of Mrs. Hedger, and although it was quite remote and immaterial it was not incompetent because it tended to show that *Hedger* had money after his arrest. The evidence to the effect that on September 16, 1909, *Hedger* mortgaged his homestead for the purpose of raising money to defray the expenses of his trial was wholly irrelevant and immaterial, but we think not prejudicial; and the same may be said of the testimony relating to conversations between the witnesses Conrad and Mrs. Nicholson as to the duty of every citizen forthwith to report to the police any information which he might have concerning the commission of the crime of murder. It is argued that the trial court erred in permitting the witnesses Miss Gilewski, Miss Casey, Mrs. Waldeck, and Mrs. Marthaler to testify that they remarked at the time of hearing the shot about 7:45 on the morning of September 9th that it was a shot or sounded like a shot. We think this was competent. It served to identify the particular sound referred to by each, to distinguish it from other sounds of the city, and to show that they each had reference to the same sound and had occasion to remember it and to note the time of its occurrence. Precisely the same kind of evidence is held to be admissible in *State v. Sexton,* 147 Mo. 89, 48 S. W. 452. A number of errors are assigned all tending to the proposition that the court refused the accused the right to properly or fully cross-examine certain designated witnesses. We have examined these rulings carefully and find no abuse of discretion on the part of the circuit court. The degree and manner of cross-examination are to a great extent in the discretion of the trial court. Some of the questions proposed on cross-examination were unfair as assuming that the witness said in chief what he had not said. Some of them extended the scope of the cross-examination beyond anything relevant to the examination in

chief, and some were so entirely immaterial that the court was justified in refusing to pursue the investigation further in that direction.

With reference to the exclusion of evidence, the verdict of the coroner's jury was properly excluded as incompetent, irrelevant, and immaterial. *Olwell v. Milwaukee St. R. Co.* 92 Wis. 330, 66 N. W. 362. This particular verdict had no bearing on the controversy before the court. Even if we give it all the solemnity and evidential effect of a judgment of a court of record, yet it merely adjudges that on the 14th day of September, 1909, the coroner and his jury did not know who killed Louise J. Hedger. 3 Wigmore, Ev. § 1671, subd. 6, and cases in note. We find no criminal prosecution in which the verdict was admitted in evidence except *State v. Tate,* 50 La. Ann. 1183, 24 South. 592, where it was admitted to show the fact of a homicide having been committed, and in another case to prove the fact of death; but there are several well-considered criminal cases where the court has refused to admit this kind of evidence, as *Wheeler v. State,* 34 Ohio St. 394; *Colquit v. State,* 107 Tenn. 381, 64 S. W. 713; *Whitehurst v. Comm.* 79 Va. 556.

It is argued that the court excluded the evidence of a witness tending to show that the police officers acted without authority in searching the office of the accused and seizing and removing to the police station his personal property and effects. If the property or papers so seized were attempted to be offered in evidence on the part of the state and objection made on this ground, this kind of testimony would be competent to exclude them, they being otherwise relevant. But there is no such showing; consequently the testimony offered was immaterial to the guilt or innocence of the accused. We perceive no error in excluding the testimony of the witness Mrs. Le Bond nor that of George Vinson. The first was in the nature of a conclusion, and the latter occurred after the witness testified that he knew of no discord between *Hedger*

and his wife, never knew of *Hedger* speaking to his wife in a
cross manner, and he was then asked whether he ever knew
of *Hedger* in any way showing any want of love and affection
for her. The accused was not prejudiced by this ruling.
It was not error to exclude the testimony of the witness Gil-
more when asked whether he had mistaken the explosion of
an automobile engine muffler or tire for the report of a re-
volver and whether he had known other people to make like
mistakes. Other errors are assigned which we have care-
fully considered, but find no ruling upon evidence which is
both erroneous and prejudicial to the accused.

The trial of this cause was begun November 26, 1909, and
after selecting a jury which was finally sworn to try the cause
the prosecution made an opening statement of the case to the
jury and several witnesses were sworn and their testimony
given before the jury thus impaneled. While the trial was
in progress and before the state rested and on December 6th,
the district attorney moved the court to direct a mistrial of
the action for the reason that one of the jurors named Will-
iam Schacht was disqualified to sit in the case on account of
having, prior to the time he was called, expressed an opinion
on the question of the guilt or innocence of the defendant.
The jury was requested to retire and the court made a sum-
mary inquiry, brought the juror Schacht into court and ex-
amined him concerning the truth of the charges against him,
hearing oral evidence on this issue. At the conclusion of
this inquiry the court summarily discharged the juror Schacht
from further attendance upon the case, sent for the remain-
ing eleven members of the jury and also discharged them, and
ordered the drawing and impaneling of a new jury and that
the case proceed to trial. Prior to accepting him as a jury-
man in the case Schacht had been examined under oath with
reference to his qualifications and accepted as a juror. The
answers that he gave were found by the court to have been
false in several important particulars, and it was shown to the

satisfaction of the court that he had discussed this case consid-
erably before being called as a juror, that he had stated that
he believed *Hedger* guilty but would never convict him upon
circumstantial evidence, and that he had talked with a deputy
sheriff and requested that he be summoned as juror.    He
qualified as a juror on his preliminary examination, and
upon the summary investigation he denied much that was
charged against him, but the court apparently found against
him, and we may assume the fact to be that the juror had prior
to the trial both formed and expressed an opinion relative to
the guilt or innocence of the accused and stated that he would
not convict the accused on circumstantial evidence, which
fact he fraudulently and falsely concealed during his ex-
amination concerning his qualifications and there gave un-
true answers under oath, but also stated that he could fairly
and impartially try the case between the state and the ac-
cused and was accepted by both the state and the accused as
a competent juror.[1]    The accused objected to the discharge of
the juror Schacht, objected to the discharge of the jury, and
when brought to trial before the second jury filed a plea of
former jeopardy, which was overruled.    To all these rulings
he took due exception.

The constitution of Wisconsin (sec. 8, art. I) provides that
"no person for the same offense shall be put twice in jeopardy
of punishment," in that respect following closely the consti-
tution of the United States (Amendm. V), which reads:
"Nor shall any person be subject, for the same offense, to be
twice put in jeopardy of punishment."    The circuit court
here exercised an extraordinary power.    The precedents are
numerous and strong in favor of the exercise of such power

[1] Immediately after the discharge of the jury on December 6, 1909,
an information was filed by the district attorney, charging the juror
Schacht with perjury; on December 28, 1909, said Schacht pleaded
"guilty," in the municipal court of Milwaukee county; and thereupon
he was sentenced to imprisonment in the state prison for a term of
three years.—REP.

notwithstanding similar constitutional restrictions.    In *Simmons v. U. S.* 142 U. S. 148, 12 Sup. Ct. 171, a jury in a criminal case had been impaneled and sworn, the trial begun, and several witnesses had testified on the part of the prosecution, when it was made to appear to the presiding judge by affidavit that one of the jurors on his *voir dire* examination had falsely sworn that he did not know the accused.    The court adjourned for some days, and during the interim counsel for the accused wrote to the district attorney and had published a letter denying the truth of this affidavit and asserting that the affiant had a quarrel of long standing with accused.    After hearing the affidavits the presiding judge found it necessary to discharge the present jury to prevent the defeat of the ends of justice and to preserve the rights of the people, and also the right of the accused to be tried by a jury every member of which can render a verdict free from constraint.    Against the objection of the accused the jury was discharged, the case came on for trial before another jury, and the presiding judge refused to permit the accused to file a plea in bar on the ground of former jeopardy. To this ruling due exception was taken.    The accused was found guilty and sued out a writ of error to the supreme court of the United States.    The brief of counsel for the plaintiff in error, a synopsis of which will be found in the report, fully presented all the objections which have occurred to us and which are made in this case against this action of the court below.    But the supreme court, on the authority of *U. S. v. Perez,* 9 Wheat. 579; *Winsor v. The Queen,* L. R. 1 Q. B. 289, 290, and *U. S. v. Morris,* 1 Curt. C. C. 23, 27, fully upheld the action of the trial court.    See, also, *Thompson v. U. S.* 155 U. S. 271, 15 Sup. Ct. 73.    The case of *U. S. v. Perez, supra,* was decided long before the adoption of our state constitution, and the interpretation there placed on the clause in question of the federal constitution was probably

then known and understood. In Michigan a like rule obtains, *In re Ascher,* 130 Mich. 540, 90 N. W. 418, 57 L. R. A. 806; in Kansas, *State v. Hansford,* 76 Kan. 678, 92 Pac. 551, 14 L. R. A. N. S. 548; in North Carolina, *State v. Bell,* 81 N. C. 591; in Massachusetts, *Comm. v. McCormick,* 130 Mass. 61. Other cases are cited in 14 L. R. A. N. S. 548 *et seq.* See, also, *People v. Sharp* (Mich.) 127 N. W. 758. When a juror has fraudulently and falsely concealed his disqualification and it is first discovered after the trial has begun, the power of the court to discharge the jury of which this disqualified juror is a member and begin the trial anew before another jury seems to be placed on the ground of absolute necessity, like the case of sickness or death of a juror or of the presiding judge. That is to say, it is absolutely necessary to discharge the first jury and begin anew in order to have a trial of the cause which is a trial and not a mere farce. This power of the circuit court is not to be lightly exercised. The state cannot for its own convenience, or in discretion, discontinue the prosecution and still hold the prisoner for trial. The power is not to be exercised except in cases in which the law recognizes and points out the necessity for such action. Within the authorities above cited the instant case was one of necessity in this respect. The rulings of the circuit court in discharging the first jury and overruling the plea of former jeopardy are approved.

It is argued that the court below erred in sustaining the challenge of the prosecution to the juror Oscar Cease. An examination of the testimony given by this juror respecting his qualifications convinces us that there was some evidence to support this ruling. The evidence is not clear or satisfactory, but the matter was one resting largely in the discretion of the trial court. That court, acting within its jurisdiction, has found as matter of fact by such ruling that the juror was not impartial. That finding is under these cir-

cumstances conclusive upon us. *Baker v. State,* 88 Wis. 140, 59 N. W. 570; *Sutton v. Fox,* 55 Wis. 531, 13 N. W. 477.

Numerous exceptions are taken to the instructions given to the jury and to the refusal of instructions requested by accused. The instructions begin with a series of abstract propositions defining murder, intent, and malice, and the jury was informed that these definitions and instructions on the elements of the crime of murder in the first degree would enable them to proceed to the consideration of the questions in the case. The question for determination is then stated, and then the nature and requisites of circumstantial evidence. The rule requiring the jury to be convinced beyond a reasonable doubt is extensively set forth, explained, and applied to the evidence in the case. The instructions then treat of the evidential quality of motive, the duty of the jury to reconcile, if possible, any apparent conflict in the testimony of witnesses, the value of expert or opinion evidence, and the evidential value of good reputation or good character. The instructions then recur to the question of intention or premeditated design, apply the rule of reasonable doubt to this, caution the jury against statements of attorneys made in argument and not supported by evidence and against considering offers of proof or testimony stricken out by the court, and again explains and defines reasonable doubt. It is said there is error in the following excerpt from the first described portion of the instructions:

"Hence when a homicide occurs and the circumstances are absent which would excuse or justify the act or reduce it to manslaughter, the law implies malice, and such killing would be murder."

This is an abstract statement, applies to all degrees of murder, and merely sums up to the jury the rule of sec. 4365, Stats. (1898). In the same portion of the instructions the court said:

"The law presumes that every reasonable person intends all of the natural, usual, and probable consequences of his acts, and when one person assaults another violently with a dangerous weapon, likely to kill, not in self-defense, not in sudden heat of passion caused by provocation apparently sufficient to make passion irresistible or involuntary, and the life of the party thus assaulted is taken in consequence of such assault, then the legal and natural presumption is that death was intended, and in such case the law implies malice, and such killing would be murder. The foregoing definitions and instructions on the elements of the crime of murder in the first degree, charged by the information, will enable you to proceed to the consideration of the questions in this case."

From another portion of the charge the following excerpt is challenged by exception:

"In determining this question you will bear in mind and apply the instructions already given you, together with the following: 'The premeditated design of murder in the first degree is simply an intent to kill.'"

Then occur these words not excepted to:

"Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent. Intent to kill means just what the ordinary signification of the word suggests."

The next following matter is excepted to:

"Whether it be described by the words 'actual intent,' 'design,' or 'premeditated design,' makes no difference. In other words, the intent is understood to be premeditated or thought of because without mental action the purpose could not be formed. When there are no circumstances to prevent or rebut the presumption, the law will presume that the unlawful act was intentional and malicious, and was prompted and determined on by the ordinary natural operations of the mind. In the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound or some act naturally and probably calculated to produce death, is presumed to have intended that result and to be guilty of

murder at the common law, and murder in the first degree under our statute.  From the circumstances of the taking of the life of a human being by the act of another, naturally and probably calculated to cause that result, the law presumes that such person, when he perpetrated the act, foresaw and intended the result which followed, hence must be guilty of the highest offense of criminal homicide known to our law, in the absence of evidence showing that the homicide was justifiable or excusable or sufficiently rebutting the presumption of intent to take human life so as to raise a reasonable doubt on the question.  That must be so, since under our statute every intentional taking of human life, not excusable or justifiable, is murder in the first degree.  When it is made to appear in the prosecution of a case like this that the accused fired the shot, the weapon being aimed at a vital part of the body, and that death ensued as a natural and probable result, the presumption of fact as to the intention to take human life, in the absence of any explanatory circumstances or evidence, makes a *prima facie* case for the prosecution.  The state is not bound to go further and negative any probability that the occurrence was the result of accident, or that there were other circumstances reducing the homicide below that of murder in the first degree, or excusing or justifying it altogether," etc.

We take it to be apparent that the court below was here first discussing implied malice but later actual intent.  These paragraphs of the charge are not grouped together in the charge as given as they appear above.  A homicide committed under such circumstances that the law implies malice is not always murder in the first degree, but it is such where there exists at the time on the part of the accused a premeditated design to effect the death of the person killed or of any human being, and this premeditated design may be proven as stated in these instructions.  We do not understand the charge to declare that murder in the first degree under our statutes, and murder at common law, are one and the same thing.  A case may be presented which would fall under both.  The accused was on trial for the statutory homicide, and how nearly this covered or included the common-law

crime of murder could be only of professional or academic interest. The charge must be tested in view of the questions before the court arising upon the information and evidence, and not academically or by contrast with the whole body of the law relating to homicide. Thus construed there is nothing in the charge in conflict with the rules laid down in *Hogan v. State,* 36 Wis. 226; *Perugi v. State,* 104 Wis. 230, 80 N. W. 593, or *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.

The next exception challenges the instructions upon the ground that they deprived the accused of the benefit of reasonable doubt arising from insufficiency or lack of evidence, and certain excerpts are presented which are thought to bear that construction, because the trial court therein stated that a reasonable doubt which entitles an accused person to an acquittal is the doubt of guilt reasonably arising from all the evidence in the case. It would be quite a technical and narrow construction of this language to hold that it excluded the right of the accused to an acquittal by reason of reasonable doubts arising from lack of evidence; but the court also said on this subject:

"This reasonable doubt that has been spoken of, this reasonable doubt which is found in the law, must be a reasonable doubt, a rational doubt, a doubt fairly arising upon the testimony and the circumstances surrounding the case." Also: "The burden of proof is upon the state to satisfy you beyond a reasonable doubt of the existence of every fact and circumstance necessary to form a conclusion of the guilt of the defendant, and this burden of proof does not shift to the defendant at any time. . . . His guilt must be affirmatively proven to a moral certainty. . . . The presumption of innocence attends the accused from the beginning to the end of the trial, and prevails, unless overcome by evidence sufficiently strong to convince and to satisfy you of the defendant's guilt beyond a reasonable doubt."

We think this subject was sufficiently covered by the charge as given, and the exception mentioned, together with the ex-

ception to the refusal to charge on this point, must therefore be overruled.

Exception is taken to the italicised portion of the following:

"Motive for the killing is an important fact in a trial for murder, and particularly so when the charge is sought to be maintained solely by circumstantial evidence. If upon a review of the whole evidence no motive is apparent, or can be fairly imputed to the accused in the commission of the crime charged against him, then this is a circumstance in favor of innocence and should be so considered by you. You have heard various theories advanced by the respective counsel in the case which they claim are based and founded upon evidence. But it is for you to determine from all the evidence in the case whether or not any adequate motive, or motive of any kind, existed for the commission of the crime charged against the defendant in this information. *But, gentlemen, motive is not essential in such a case. Presence or absence of it is an evidentiary circumstance merely bearing, with more or less weight according to the circumstances, on the question of guilt.* I also charge you, gentlemen of the jury, that it is an admitted fact in this case that the deceased was the wife of the defendant, and that the presumption that she was not killed by her husband, or that the killing was not done with malice aforethought, is very strong."

While the foregoing cannot be considered a model in this respect, we find no prejudicial error therein. On the whole it seems to be a substantially correct exposition of the law. *Spick v. State,* 140 Wis. 104, 121 N. W. 664; 12 Cyc. 149.

Exception was taken to the following:

"I also instruct you that if there be a conflict of testimony of the witnesses called, the presumption is that either one or the other of the witnesses may be honestly mistaken rather than that either wilfully testified falsely."

Technically speaking this is not a presumption of law, but the meaning of the court is apparent and the effect not misleading. *Petrich v. Union,* 117 Wis. 46, 93 N. W. 819. It

Hedger v. State, 144 Wis. 279.

is equivalent to telling the jury that the theory of honest mistake should be adopted presumably rather than the theory of wilfully false swearing. We are inclined to the belief that this portion of the charge was rather favorable to the accused than otherwise.

Further exception is taken to the following:

"There has been considerable testimony in this case given by experts, and many questions were put and answered upon a hypothetical state of facts. In weighing the answers to such questions it is important for you to keep in mind the facts which were stated in such questions upon which said experts were called to give their opinions. If such facts were not in material respects the same as you find them to exist, after consideration, in this case, such opinions would be necessarily weak, if not valueless."

This was correct. It is a proper instruction with reference to hypothetical expert opinions.

Exception is taken to the following: "Evidence of good reputation or good character does, however, not constitute a defense." Standing alone this might be subject to criticism as misleading. Whether it was correct or not depends upon what is meant by the word "defense." Certainly one could not justify a criminal act or defeat a criminal prosecution on the sole ground that he was a person of good character. But the whole instruction on this point was as follows, and was not erroneous or misleading within the rule of *Niezorawski v. State,* 131 Wis. 166, 111 N. W. 250, and *Schutz v. State,* 125 Wis. 452, 104 N. W. 90, and cases there cited:

"You are instructed that evidence of good character or reputation of the defendant for being a peaceable and quiet citizen is admitted for the purpose of leading the jury to believe that the accused is not likely to have committed the crime charged against him. In a case depending entirely upon circumstantial evidence, where in addition the testimony for and against the accused is in conflict, it may become very important. Evidence of good reputation or good character does, however, not constitute a defense. It is en-

titled to all the consideration you think proper to give it under all the circumstances of the case. The fact of good character or good reputation is of no significance in any case in the face of satisfactory evidence of guilt in the judgment of the jury after giving due weight to such previous character and reputation. If the jury believes, from the evidence, beyond a reasonable doubt, that the accused committed the offense charged against him, it is their duty to convict though they believe that prior to the commission of the offense his character and reputation were inconsistent with such commission. You are further instructed that if you can reconcile the evidence before you upon any reasonable hypothesis consistent with defendant's innocence, you should do so and in that case acquit the defendant."

. Taking the charge on this subject all together it becomes very apparent in what sense the court used, and the jury probably understood, the word "defense." The evidence of good character is not minimized by the whole instruction, but we think fairly submitted to the jury with the other facts in the case. No error was committed in cautioning the jury against statements or arguments by the attorneys for the prosecution which had no support in the evidence, although this is made a point of exception.

The following unfortunate expression is also made the subject of exception: "Unless the evidence fails to impress your minds beyond a reasonable doubt of the defendant's guilt you should acquit him." If double negatives were always understood by ordinary people as they are by grammarians to express an affirmative, this statement in the charge might be both incorrect and prejudicial; but they are not always so understood, and in view of the many times that the court in the same charge stated this same proposition correctly, we think the jury was not misled nor the defendant prejudiced by this slip of the tongue. *Dillon v. State,* 137 Wis. 655, 119 N. W. 352.

The remaining exceptions are very numerous and were taken to alleged improper and prejudicial remarks made by

the attorneys for the prosecution in their opening statement, during the trial, and upon the argument, and also to alleged improper and prejudicial remarks made by the circuit judge in the presence and hearing of the jury during the progress of the trial. We have examined them carefully, but in view of the number of points already gone over in detail and consequent inordinate length of this opinion we overrule all such exceptions without discussion, except to say that the trial court instructed the jury to disregard these remarks at the time they were made and also in his instructions to the jury. On the part of the prosecution, zeal seems to have somewhat outrun discretion, and eloquence to have broken away from the restraint of facts, but not to such extent as to affect the verdict or warrant a reversal of the judgment in a case like this in which the learned trial judge, by his conduct of the trial and his rulings, corrected any errors in this regard so that the accused was not prejudiced thereby. The exceptions taken to remarks made by the circuit court in the presence of the jury are not well taken. We find nothing in these remarks either improper or prejudicial to the accused. Another set of exceptions was taken to rulings of the trial court in refusing to strike out evidence. These have been covered by what has been said relative to the admission and exclusion of evidence. They have been examined and considered and in the judgment of the court must be overruled.

Overruling a motion for a new trial on the ground of newly discovered evidence, the learned trial judge said:

"I find it to be the court's duty to deny the motion. The evidence has convinced me that the story related by the witness Braeutigam, as to what he states to have seen and heard in front of the defendant *Hedger's* home on September 9, 1909, has no truth in it. In fact I do not believe that this man Braeutigam ever went near the Hedger home on that morning. It is either an entire fabrication, or due to delusion, or arising from both. While it may be due to delusion or abnormal condition of mind, I believe it is a story

fabricated by the witness Braeutigam for the purpose of obtaining notoriety, or perhaps is loose, careless, and irresponsible talk, without recognizing its possible consequences, spread among his friends and acquaintances, but which he, when called upon to verify or deny, had not the moral courage to deny because he feared it would expose him to the ridicule of his friends. His moral sense is of so low an order, as has been shown upon this hearing, and so weak that it did not deter him from repeating that story in court, though placed under oath. In fact, I came to the conclusion while listening to this testimony that the witness Braeutigam did not seem to understand or be impressed by the importance of the oath at all. . . . I am also of the opinion that no better estimate of his said testimony would be given by any jury of ordinarily intelligent men who might be called upon to try the defendant's case if a new trial should ever take place. I am convinced that if a new trial of defendant's case should be ordered, the testimony of this man Braeutigam, in the face of all the other evidence heretofore given in that case and in conjunction therewith, will not tend to change the result of the case; that there is no probability, in case of a new trial, that a jury of honest and ordinarily intelligent men with that testimony in the case will ever agree upon a verdict different from the one rendered."

Is this decision warranted by the showing for a new trial? The newly discovered evidence was that of a witness named Braeutigam. His testimony is that on the morning of September 9, 1909, he left his home at 1314 Cold Spring avenue about 8 o'clock, going down town by way of Thirteenth and Cedar streets, and that shortly after 8 o'clock, when he was on the north side of Cedar street and fifteen or twenty feet east of Thirteenth street and about opposite the Waldeck residence, he heard a shot and saw a man come out of the front door of the Hedger home. This man he describes as a tall man, smooth shaven, and having a yellow or sallow complexion. The man jumped over the rail into the alley and joined another man who had been apparently waiting at the Cedar-street entrance to the alley, and both proceeded south

through the alley toward Wells street. He met and recognized the first mentioned man several days thereafter on one of the down-town streets. He informed his wife and daughter and some intimates of this on the evening of the 10th, told his daughter that the man coming out of the house looked excited and pale, and informed several people that he was on his way down town to buy some brushes when he heard the shot and saw these men. His testimony is full of contradictions and absurdities. A man coming out of the front door of the Hedger house, crossing the narrow sidewalk and jumping over the rail into the alley, and then proceeding southward, could not be recognized, identified, or described by one standing where Braeutigam says he was. This is a fact of common knowledge. It may be demonstrated by looking across a street of ordinary width at some one on the opposite sidewalk going in the same direction and about 100 feet ahead. But in the case at bar there was the storm house interposed between Braeutigam and this alleged person during part of the exit of the latter, and there were only two or three strides at most to bring this person to the rail, and after he jumped over the rail and proceeded down the alley his back was turned to Braeutigam. Notwithstanding this the witness testifies that the man was smooth shaven, that his complexion was yellow or sallow, and claims he met and recognized the person in another part of the city several days later. When his daughter read the account of the murder in the newspaper he said to her: "Those two I know well. I know the murderer also." This was quite an extravagant statement for a man who had only such opportunities for examination to make, and this seems to be the first time he mentioned it. He also said that his wife and friend Schimmel advised him not to mix up in the matter or tell his story to the police. Also that he went to the city hall and tried to give information in the beginning of December, 1909, and was at the city hall eight or ten times in the fall of 1909;

that he told one or more policemen about it, but they deny that he had done so; that he never was back to the Hedger house since; that he was back to the Hedger house the day before he made this statement and also on the 13th of September, 1909, with Schimmel; that he was going down town to transact business, to buy brushes, at the time he heard this shot, that is what he started for, and several witnesses to whom he told the story testify that he said to them this was his errand. He was not going to buy brushes, he told that to fool his wife; but he had an appointment with one Frank Franz or Franz Frank, who said he lived on Center street but who could not be found in the city. He had seen Frank three or four or five times before that, but did not know where they were going to meet down town. There was no place of meeting fixed. He then shifted his ground and said he was going down town for amusement, but would rather die than have his wife know it. This amusement consisted of a grind organ. Reminded of the improbability of his statement that he would rather die than have his wife know he was going down town to hear a hand organ he said his object was a grind organ, a few ladies, and some nonsense, and that if he made a side spring he does not tell his wife. He never saw this man Frank since. He dictated to his nineteen-year-old daughter or requested her to write letters of an exceedingly obscene character. At one time he stated that he told the story of hearing this shot and seeing the man leave the Hedger residence and jump into the alley to 200 people; that when a crowd gathered he would tell it. He later testified that he said this because "it was to laugh" because they did not want to believe him. Being reminded that four persons had testified that the only shot heard in that neighborhood that day was fired at twenty minutes to 8 o'clock in the morning, he said he either must swear false or they must swear false. It was suggested to him by question that he might be mistaken and he answered: "Yes, you were

right; my clock goes sometimes an hour fast, so that I may be from three quarters to one hour mistaken. I do not claim that that man shot her; *Hedger* may be the man still. I do not swear that I saw him go out of the door, I saw him go over the fence." He also testified: "I saw him come out of the storm door. . . . I said he came out of the door, but I don't claim that he came out of the storm door. What kind of a door is that in that front house?" It is quite manifest that the witness did not at this time remember that the front entrance was only through a storm shed and that the door of the storm shed was on the east side of it, thus partially excluding the man from his view. He also contradicted himself with reference to the place of meeting this man several days later, with reference to his object in going down town on that day as well as on September 9th, with reference to the persons to whom he told the story, with reference to what he told them, and in other respects. Five physicians were appointed by the court to inquire and report concerning his sanity. Two of them found him insane, two sane, and the fifth found that he had mental defects "of such a character that affect his intelligence, his moral sense, his memory, his relations to his surroundings and his judgment, vitiating them all relatively and correspondingly invalidating his statements." He was contradicted on material points by several witnesses with respect to his past history and also with respect to his whereabouts in the forenoon of September 9, 1909. Some workmen who knew him and worked with him described his doings and considered him "nutty." Some years before, the district attorney, under the belief that Braeutigam was mentally unsound, refused to prosecute him for challenging a man to fight a duel. In short, his sanity, his veracity, and his general character were impeached by himself and by others. This condition justified the circuit court in denying the motion for a new trial on the grounds stated by that court and hereinbefore quoted. *Conradt v.*

*Sixbee,* 21 Wis. 383; *Loucheine v. Strouse,* 49 Wis. 623, 6 N. W. 360; *Keeley v. Great Northern R. Co.* 139 Wis. 448, 121 N. W. 167; *Goldsworthy v. Linden,* 75 Wis. 24, 43 N. W. 656; *Mueller v. Pew,* 127 Wis. 288, 106 N. W. 840; *Anderson v. Arpin H. L. Co.* 131 Wis. 34, 110 N. W. 788; 12 Cyc. 738, 739.

The accused has been represented by able counsel who have diligently presented his cause in this court and in the court below and apparently have left nothing undone in the discharge of their duty toward their client. But the accused has, in our opinion, had a full and fair trial according to law. In such a long trial in a hotly contested case some irregularities are inevitable. Perfection is unattainable. We are however convinced that no substantial error prejudicial to the accused or calling for a reversal of this judgment has been committed, hence the judgment and order denying a new trial must be affirmed.

*By the Court.*—Judgment and order affirmed.

A motion for a rehearing was denied January 10, 1911.